FILED
COURT OF APPEALS
DIVISION II

2014 FEB 11 AM 8: 36

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43218-8-II |
| Respondent, | |
| v. | |
| CHADWICK LEONARD KALEBAUGH, | PART PUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Chadwick Kalebaugh appeals his first degree child molestation conviction based on conduct involving five-year-old HS. Kalebaugh argues that (1) the trial court's preliminary instruction undermined his presumption of innocence, (2) insufficient evidence supports his conviction, (3) the prosecutor made improper arguments in closing, (4) the trial court erroneously instructed the jury regarding "sexual contact," and (5) cumulative error rendered his trial unfair. In the published portion, we hold that Kalebaugh failed to preserve the preliminary instruction error. In the unpublished portion of this opinion, we hold that (1) the State sufficiently proved the crime, (2) the prosecutor's arguments were neither improper nor prejudicial, (3) the trial court's instruction was neither erroneous nor prejudicial, and (4) Kalebaugh does not demonstrate cumulative error. Accordingly, we affirm.

FACTS

The events leading to Kalebaugh's conviction occurred on the night of October 28 through 29, 2011, after a gathering at the Napavine home of Kristal Strong, where Kalebaugh lived. Strong called police after a guest at the house, Jacob Murphy, accused Kalebaugh of inappropriately touching HS. HS is the child of Tiffany,[1] who was also staying at Strong's house. The State charged Kalebaugh with first degree child molestation, alleging as aggravating factors that Kalebaugh used a position of trust or confidence to facilitate the offense and knew or should have known the victim was particularly vulnerable or incapable of resistance.

TRIAL TESTIMONY

At trial, the responding Napavine police officer, Noel Shields, testified that after interviewing various residents and guests, he read the *Miranda*[2] warnings to Kalebaugh, who waived his rights and spoke voluntarily with Shields. Kalebaugh denied Murphy's accusation, claiming that he had not even been in the room with Murphy and HS at the time.

Only Murphy testified to having seen Kalebaugh touch HS.[3] Murphy testified that shortly after arriving at the house, he laid down on a reclining couch in the downstairs living room to try to sleep. In the same room he saw two boys sleeping on another couch, and HS sleeping on the loveseat. As Murphy was falling asleep, he opened his eyes and saw Kalebaugh in the room.

---

[1] We use initials and omit Tiffany's surname to protect the minor victim's privacy.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] In accordance with the trial court's rulings, HS did not testify, nor did any witness testify, as to any statements HS may have made concerning the events.

2

Murphy saw Kalebaugh next to HS, "chest up against the love seat with his hand underneath the blanket towards the little girl's groin area . . . [m]aking a back and forth movement." 2 Report of Proceedings (RP) at 74. When asked whether Kalebaugh's arm was "over the area of [HS's] vagina," Murphy answered, "I couldn't really tell because of the blanket, but the direction of his arm looked like it was." 2 RP at 75.

Murphy testified that Kalebaugh's back was to him at the time, so he could not see Kalebaugh's face or demeanor. Murphy acknowledged that no lights were on in the room, but he testified that he had no trouble seeing because of the porch light shining in through a window. On cross-examination, Murphy admitted that other than seeing Kalebaugh's hand moving under the blanket somewhere "above [HS's] knee and below her belly button," he could not tell what was happening. 2 RP at 107.

As soon as Murphy opened his eyes and saw the movement, he confronted Kalebaugh, saying, "You know what you are doing is way wrong." 2 RP at 77. Kalebaugh looked "[l]ike he went to a surprise party," in Murphy's words, then "rolled over . . . and pretended he was asleep." 2 RP at 77-78.

The other evidence tending to support Murphy's accusation came from Tiffany, who described HS's clothing after the incident.[4] Tiffany testified that when she checked on HS after hearing Murphy's accusation, HS's shorts were wrinkled and "[p]ushed up towards her hip" on the left side, exposing her underwear. 2 RP at 27. Tiffany testified that she had never seen HS's shorts in such a condition after sleeping. Tiffany also testified that she had known Kalebaugh for

---

[4] A nurse practitioner testified that her examination of HS a few days after the incident revealed no physical evidence of abuse but that she considered such an absence of findings normal in child sexual abuse cases.

3

only a couple weeks, and that she had not entrusted him with any caretaking responsibility for her children.

JURY INSTRUCTIONS AND CLOSING ARGUMENT

The trial court's preliminary oral instruction concerning reasonable doubt given to the venire before voir dire included two additional sentences following the standard instruction outlined in 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 85 (3d ed. 2008) (WPIC):

> If after your deliberations you do not have a doubt for which a reason can be given as to the defendant's guilt, then, you are satisfied beyond a reasonable doubt.
>      On the other hand, if after your deliberations you do have a doubt for which a reason can be given as to the defendant's guilt, then, you are not satisfied beyond a reasonable doubt.

1 RP at 9. Kalebaugh did not object. Prior to closing argument, the court gave, orally and in writing, the pattern instruction on reasonable doubt.

Also prior to closing argument, the trial court read the State's proposed instruction defining "sexual contact," which in addition to the pattern instruction, included the following language:[5]

> Contact is intimate, if the contact is of such a nature that a person of common intelligence could be fairly expected to know that under the circumstances the parts touched were intimate and therefore the touching was improper. When considering when a particular touching is done for the purpose of gratifying a sexual desire, you may consider among other things the nature and the circumstances of the touching itself. Sexual contact may occur through a person's clothing.

---

[5] The pattern instruction defines "sexual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party." 11 WPIC 45.07, at 839.

2 RP at 169. Kalebaugh objected to the State's proposed instruction because of the language added to the pattern instruction; he requested only the pattern instruction. The trial court overruled the objection, stating that the State provided adequate authority for the proposed instruction. The oral instruction deviated slightly from the written instruction provided to the jury, which stated, "Contact is 'intimate' if the *conduct* is of such a nature." Clerk's Papers (CP) at 25 (emphasis added).

Kalebaugh also objected to two arguments the State made in closing concerning what is an "intimate part" for purposes of "[s]exual contact." 3 RP at 11-12. First, the prosecutor argued that "you as a jury get to decide what counts as an intimate part of the person's body." 3 RP at 11. Second, the prosecutor stated that

> even though the touching was above the knees and below the belly button, and when asked[,] [Jacob] Murphy said it was towards the middle of that zone, that's right over the vagina, and even if it was closer to the knees or closer to the belly button, rubbing on her, that's an intimate area. Anywhere in that zone is intimate. You wouldn't feel comfortable with a stranger touching you anywhere near, probably nowhere on your body, but especially nowhere between that zone. That's an intimate part of your body.

3 RP at 11-12. The trial court overruled those two objections.

The jury returned a guilty verdict and found by special verdict that Kalebaugh had known the victim was particularly vulnerable or incapable of resistance. The jury found, however, that Kalebaugh had not used a position of trust or confidence to facilitate the crime. Kalebaugh timely appeals.

## ANALYSIS

### PRELIMINARY INSTRUCTION

Although Kalebaugh did not timely object to the trial court's preliminary oral instruction about reasonable doubt to the entire venire, he now argues for the first time on appeal that it

improperly imposed an articulation requirement, a manifest error affecting a constitutional right warranting reversal. He analogizes the trial court's preliminary oral instruction to "fill-in-the-blank" prosecutorial misconduct cases and asserts that the trial court's preliminary instruction improperly shifted the burden of proof to Kalebaugh. We hold that Kalebaugh has not demonstrated a manifest constitutional error and accordingly has failed to preserve this issue for appellate review.

Generally, we will not entertain a claim of error not raised before the trial court. RAP 2.5(a). An exception to that general rule is RAP 2.5(a)(3), which requires an appellant to demonstrate a manifest error affecting a constitutional right. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011). "Stated another way, the appellant 'must identify a constitutional error and show how the alleged error actually affected the appellant's rights at trial.'" *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)).

To determine if an error is of constitutional magnitude, we look to whether, if the defendant's alleged error is true, the error actually violated the defendant's constitutional rights. *O'Hara*, 167 Wn.2d at 98. An error is manifest if it is so obvious on the record that the error warrants appellate review. *O'Hara*, 167 Wn.2d at 99-100. But appellants must also demonstrate "actual prejudice," meaning the defendant must plausibly show the asserted error had practical and identifiable consequences at trial. *Gordon*, 172 Wn.2d at 676.

No Washington case addresses whether if a trial court misstates the preliminary oral instruction on reasonable doubt to the entire venire but gives a correct final oral and written instruction to the empanelled jury, such a misstated preliminary instruction constitutes a manifest

error affecting a constitutional right. Accordingly, this is a matter of first impression in our state. But we may look to other jurisdictions for guidance.

In Connecticut, for example, similar to our RAP 2.5(a) analysis which requires an appellant to demonstrate a manifest error affecting a constitutional right, its courts will address the merits of an unchallenged claim of constitutional error if an appellant can show that the claim is of constitutional magnitude and that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial. *See State v. Golding*, 213 Conn. 233, 239-40, 567 A.2d 823 (1989). Under this preservation standard, an appellant must show a clear constitutional violation that clearly deprived him or her of a fair trial. *State v. Figueroa*, 235 Conn. 145, 184-85, 665 A.2d 63 (1995). Essentially, in Connecticut, an appellant may raise for the first time on appeal an alleged error regarding the trial court's preliminary instruction only if "'considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled.'" *Figueroa*, 235 Conn. at 183 (quoting *State v. Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993)). In other words, Connecticut requires a showing of reasonable prejudice. *See Figueroa*, 235 Conn. at 184. And Connecticut courts hold that, generally, improper preliminary instructions challenged for the first time on appeal do not give rise to prejudice because preliminary instructions "'do not supersede those given after evidence and arguments'" when the jury is properly instructed "'at the critical time, after all the evidence and after the arguments of counsel.'" *State v. Lewis*, 220 Conn. 602, 614, 600 A.2d 1330 (1991) (quoting *State v. Woolcock*, 201 Conn. 605, 623, 627, 518 A.2d 1377 (1986)).

In *Figueroa*, for example, one of the trial court's preliminary instructions stated that it would be improper to use a "woman's intuition" to determine reasonable doubt. 235 Conn. at 182-83. The trial court then properly instructed the empanelled jury about reasonable doubt in

its final written instructions. *See Figueroa*, 235 Conn. at 184. Figueroa argued that the trial court's preliminary instruction created an improper articulation requirement, an error that the final instruction could not cure. *Figueroa*, 235 Conn. at 182-83. The Connecticut Supreme Court disagreed and affirmed Figueroa's conviction, asserting that it was not reasonably possible that the preliminary instruction misled the jury because the trial court "fully and correctly instructed as to the principles of the defendant's presumption of innocence and the state's burden of proof beyond a reasonable doubt at final instructions." *Figueroa*, 235 Conn. at 184. Accordingly, Figueroa could not demonstrate prejudice and, therefore, did not preserve the issue for appeal. *See Figueroa*, 235 Conn. at 184-85.

Similarly, here, Kalebaugh cannot show a manifest error affecting a constitutional right. Even assuming, without deciding, that the preliminary reasonable doubt instruction offered here constitutes an error of constitutional magnitude, Kalebaugh does not demonstrate manifest error. Therefore, as in *Figueroa*, he did not demonstrate prejudice and, consequently, did not preserve this issue for our review. *See* RAP 2.5(a).

Although the preliminary instruction error was obvious because of the Washington Supreme Court's directive in *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), to only use the 11 WPIC 4.01 language on reasonable doubt to instruct the jury,[6] Kalebaugh does not show prejudice—he cannot show that the preliminary instruction had practical and identifiable trial consequences. Like *Figueroa*, here the trial court made an error in articulating the reasonable doubt standard in a preliminary oral instruction, but it properly instructed the jury, orally and in writing, at the critical time—after the presentation of evidence. It is not reasonably

---

[6] And 11 WPIC 1.01, at 3-8 (3d ed. Supp. 2011) uses 11 WPIC 4.01's language on reasonable doubt. *See* 11 WPIC 1.01 at 3-8; 11 WPIC 4.01 at 85.

possible that the trial court's preliminary instruction misled the jury considering that the trial court properly instructed the jury on reasonable doubt in its final oral and written instructions, which the jury used during deliberations. Like *Figueroa*, there is no reasonable possibility that the preliminary instruction misled the jury.

Moreover, Kalebaugh's reliance on prosecutorial misconduct cases is unpersuasive. Prosecutorial misconduct cases do not help in determining whether Kalebaugh can show actual prejudice from a preliminary instruction. In *State v. Emery*, 174 Wn.2d 741, 761, 763, 278 P.3d 653 (2012), our Supreme Court simply said that the "fill-in-the-blank" argument "*could potentially* have confused the jury about its role and the burden of proof," and that a proper instruction could have cured the potential confusion. (Emphasis added.) Here, the trial court actually read the empanelled jury the correct WPIC on reasonable doubt after the presentation of evidence, and the jury received three hard copies for deliberations, potentially curing any lingering confusion. We simply cannot draw clean parallels between cases involving a prosecutor's fill-in-the-blank argument during closing, and a trial court's improper preliminary instruction before the presentation of evidence.

Kalebaugh failed to demonstrate prejudice; accordingly, he did not properly preserve this issue to be considered for the first time on appeal. *See* RAP 2.5(a).

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## SUFFICIENT EVIDENCE

Kalebaugh next argues that the State presented insufficient evidence that he touched HS's "sexual or other intimate parts," or that he touched HS "for the purpose of gratifying sexual

desire." Br. of Appellant at 27. We disagree because the jury could rationally have inferred from the evidence that (1) Kalebaugh touched HS's upper inner thigh under the clothing (2) to gratify a sexual desire.

We review claims of insufficient evidence to determine whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences from the evidence in favor of the State and against the defendant. *Salinas*, 119 Wn.2d at 201. A sufficiency challenge admits the truth of the State's evidence and all reasonable inferences from it. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980). We leave credibility determinations to the fact finder and do not review them on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Under RCW 9A.44.083(1), a person is guilty of first degree child molestation

> when the person has . . . sexual contact with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.

Sexual contact means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(2).

First, regarding the touching of a sexual or other intimate part, we have held that the "upper inner thigh" is "intimate" for sexual contact purposes. *State v. Harstad*, 153 Wn. App. 10, 22, 218 P.3d 624 (2009). Here, the jury heard eyewitness testimony that Kalebaugh's hand made a back and forth motion under the blanket in the vicinity of HS's groin and that after HS woke up, one leg of her shorts was pushed up, exposing her underwear. From those facts, the jury could rationally have inferred that Kalebaugh placed his hand in contact with HS's groin area, her intimate parts.

10

Second, regarding sexual gratification, we have held that "'[p]roof that an unrelated adult with no caretaking function has touched the [unclothed] intimate parts of a child supports the inference the touch was for the purpose of sexual gratification,'" although some additional evidence is required. *Harstad*, 153 Wn. App. at 21 (quoting *State v. Powell*, 62 Wn. App. 914, 917, 816 P.2d 86 (1991), *review denied*, 118 Wn.2d 1013 (1992)). As just shown, the jury could rationally have inferred that Kalebaugh touched HS's upper inner thigh or groin area, an "intimate" area for purposes of sexual contact. The State also presented evidence that (1) Kalebaugh made a back and forth movement on this intimate area; (2) Kalebaugh had no caretaking role in HS's life; (3) the events occurred at night while HS slept; (4) the events occurred in a room where everyone else also appeared to be asleep; and (5) after Murphy confronted Kalebaugh, a startled Kalebaugh feigned sleep, without offering any explanation. From those facts, the jury could rationally have inferred Kalebaugh acted for sexual gratification.

Taken in the light most favorable to the State, any rational trier of fact could have inferred that Kalebaugh touched an intimate part of HS to gratify a sexual desire. Thus, we hold that sufficient evidence supports his conviction.

PROSECUTORIAL MISCONDUCT

Kalebaugh next argues that the prosecutor made improper arguments concerning what constitutes sexual contact, depriving him of a fair trial. Specifically, Kalebaugh argues that two of the prosecutor's statements to the jury misstated the law and constituted misconduct: (1) that the jury gets to "'decide what counts as an intimate part of the person's body,'" and (2) that the entire zone between the knees and the belly button constitutes "'an intimate part of your body.'" Br. of Appellant at 40 (quoting 3 RP at 11-12). We disagree, because even if the prosecutor's statements were improper, Kalebaugh cannot show prejudice.

11

An appellant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). A defendant suffers prejudice only where there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert denied*, 523 U.S. 1007 (1998). We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *Brown*, 132 Wn.2d at 561.

Regarding the first statement, Kalebaugh argues that it misstates the law because it allows jurors to find that any body part is intimate, including a person's forehead or elbow. Kalebaugh's argument mischaracterizes the record. The prosecutor's argument as a whole limited the jury's focus to the zone between the belly button and knees. Because Kalebaugh bases his entire argument on a faulty premise, he does not demonstrate improper conduct.

Regarding the second statement, Kalebaugh argues that it misstates the law because *Harstad* holds that "only" body parts in close proximity to the primary erogenous areas are intimate parts. Kalebaugh, however, mischaracterizes *Harstad*. *Harstad* affirms the rule that contact is intimate if, under the circumstances, a person of common intelligence could fairly be expected to know that the body parts being touched were intimate. 153 Wn. App. at 21. Here, the prosecutor's statement accurately reflected the law because rational jurors could conclude from their common knowledge that the zone between the knees and the belly button is intimate because of its close proximity to one's erogenous areas. *See Harstad*, 153 Wn. App. at 21; *State v. Jackson*, 145 Wn. App. 814, 819, 187 P.3d 321 (2008). Thus, Kalebaugh fails to demonstrate a misstatement of law or improper conduct.

Even if we assume that the prosecutor's statements were improper, Kalebaugh cannot demonstrate a substantial likelihood that they affected the verdict. Based on Tiffany's testimony concerning HS's shorts having been shifted to expose her underwear and Murphy's testimony that the touching occurred in HS's groin area in the dark while she was sleeping, Kalebaugh does not demonstrate that the jury's verdict would have differed had the prosecutor not made those two statements. Accordingly, Kalebaugh's claim fails.

JURY INSTRUCTION

Kalebaugh next argues that the trial court's instruction defining "sexual contact" misstated the law to his prejudice. We disagree that the instruction misstated the law, but even if it did, Kalebaugh does not demonstrate prejudice.

We review a challenged jury instruction de novo, examining it in the context of the instructions as a whole. *Bennett*, 161 Wn.2d at 307 (citing *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996)). The instructions must not mislead jurors or fail to properly inform them of the applicable law. *Bennett*, 161 Wn.2d at 307 (citing *State v. LeFaber*, 128 Wn.2d 896, 903, 913 P.2d 369 (1996), *abrogated by O'Hara*, 167 Wn.2d 91). We must reverse if a trial court's erroneous instruction prejudiced the complaining party. *State v. Aguirre*, 168 Wn.2d 350, 364, 229 P.3d 669 (2010).

Kalebaugh challenges the trial court's instruction, which Division One of this court held valid in *Jackson*. "Contact is 'intimate' if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper." CP at 25; *Jackson*, 145 Wn. App. at 819. He first argues that the trial court misstated the law when reading this instruction to the jury by substituting "conduct" with "contact." He further argues that the instruction

13

inappropriately allowed the jury to find any body part intimate without reference to the primary erogenous areas. Both arguments fail.

Regarding the "contact" instead of "conduct" argument, the trial court's written instructions correctly stated "conduct," and the jury had three copies of the written instructions for deliberations. Kalebaugh nevertheless argues that the oral instruction erroneously directed the jury to focus on the contact rather than his overall conduct. To the extent that this oral instruction confused the jury, it could reread the correct written instruction to cure any confusion. Moreover, Kalebaugh cannot demonstrate prejudice. Conceptually, "contact" is simply a narrower subset of one's "conduct." Kalebaugh does not demonstrate how the jury's focus on "contact" rather than "conduct" prejudiced him. Thus, his claim fails.

Regarding the instruction as a whole, we disagree that it inappropriately allowed the jury to find any body part intimate. Kalebaugh argues that the proper definition of "intimate" contact comes from *Harstad*, where Division One determined, in addition to the approved language in *Jackson*, "[a] jury may determine that 'parts of the body in close proximity to the primary erogenous areas' are intimate parts." 153 Wn. App. at 21 (quoting *In re Welfare of Adams*, 24 Wn. App. 517, 521, 601 P.2d 995 (1979)). Contrary to Kalebaugh's argument, Division One never determined that courts must include the "close proximity" language in the jury instruction or else the *Jackson* language would be misleading. *See Harstad*, 153 Wn. App. at 21. The instruction here properly directed the jury to use its common knowledge to determine under the circumstances if the parts touched were intimate. *Jackson*, 145 Wn. App. at 819. Regardless, even if the instruction was erroneous, Kalebaugh does not demonstrate prejudice. The jury heard testimony that HS's shorts were shifted to expose her underwear and that the touching occurred in HS's groin area in the dark while she was sleeping. Kalebaugh does not demonstrate that the

14

jury's verdict would have differed had the trial court included the phrase "in close proximity to the primary erogenous areas" in the sexual contact definition. Thus, his claim fails.

## STATEMENT OF ADDITIONAL GROUNDS

Kalebaugh filed a statement of additional grounds. He asserts that although the trial court sustained his objections, two of the prosecutor's statements prejudiced him. We disagree.

The prosecutor's first statement was that "the first part is there's touching, either of a sexual or other intimate part of the body, and I submit to you that I think both were touched here." 3 RP at 12. The second statement was that "[w]e don't have the technology to go back in time and stop bad things from happening. We don't have the technology to take bad memories out of people's minds. Tiffany and [HS] have to live with what happened." 3 RP at 40. The trial court sustained both objections and instructed the jury to disregard the second argument.

Because the trial court properly sustained both objections and instructed the jury to disregard any argument not supported by the evidence, Kalebaugh does not demonstrate prejudice warranting reversal. We presume that jurors follow the instructions provided. *State v. Ervin*, 158 Wn.2d 746, 756, 147 P.3d 567 (2006). And Kalebaugh presents no reason to believe that this instruction failed to cure any prejudice; accordingly, his claims fail.

## CUMULATIVE ERROR

Finally, Kalebaugh argues that even if we find that none of the errors discussed above are sufficient grounds for reversal, their cumulative effect denied him a fair trial. Again, we disagree.

We reverse a conviction under the cumulative error doctrine "when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390

No. 43218-8-II

(2000). Here, of the errors he preserved for appeal, Kalebaugh demonstrates no prejudice. Thus, his claim fails.

We affirm.

_____
JOHANSON, A.C.J.

I concur:

_____
PENOYAR, J.

BJORGEN, J. (dissenting) — The logic and policy of the decision in *State v. Emery*, 174 Wn.2d 741, 278 P.3d 653 (2012), impels the conclusion that the preliminary reasonable doubt instruction in this prosecution was constitutionally flawed. Under the standards of *State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009), and *State v. Gordon*, 172 Wn.2d 671, 260 P.3d 884 (2011), this constitutional error was manifest under RAP 2.5(a), allowing Kalebaugh to raise it for the first time on appeal. Accordingly, I dissent from the majority's holding to the contrary. Reaching the merits of the appeal, the reasoning of *Emery* obliges the conclusion that this error requires reversal unless the State can prove it harmless beyond a reasonable doubt. Because the State did not make that showing, I would reverse.

## I. KALEBAUGH MAY CHALLENGE THE PRELIMINARY REASONABLE DOUBT INSTRUCTION FOR THE FIRST TIME ON APPEAL

The trial court added the following passages to the standard Washington pattern instruction on reasonable doubt in its preliminary oral jury instructions:

> If after your deliberations you do not have a doubt for which a reason can be given as to the defendant's guilt, then, you are satisfied beyond a reasonable doubt.
>
> On the other hand, if after your deliberations you do have a doubt for which a reason can be given as to the defendant's guilt, then, you are not satisfied beyond a reasonable doubt.

Verbatim Report of Proceedings (VRP) (Jan. 3, 2012) at 10. Kalebaugh did not timely object to this instruction before the trial court. Thus, under RAP 2.5(a) we are only obliged to consider his challenge under limited circumstances, one of which is the claim of a manifest error affecting a constitutional right.

A.    The preliminary reasonable doubt instruction was erroneous and affected a constitutional right.

Determining whether challenged action was erroneous for purposes of RAP 2.5(a) necessarily bleeds into an analysis of the merits of the claimed error. As the court recognized in *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001), in determining whether an error is manifest, we "preview[] the merits of the claimed constitutional error to determine whether the argument is likely to succeed."

In 2009 we held a prosecutor's closing argument improper because it implied that jurors needed to articulate the reason for any reasonable doubt. *State v. Anderson*, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009). The prosecutor had informed the jury that "in order to find the defendant not guilty, you have to say 'I don't believe the defendant is guilty because,' and then you have to fill in the blank." *Anderson*, 153 Wn. App. at 431. We explained that "[b]y implying that the jury had to find a reason in order to find Anderson not guilty, the prosecutor made it seem as though the jury had to find Anderson guilty *unless* it could come up with a reason not to," thereby undermining the presumption of innocence. *Anderson*, 153 Wn. App. at 431.

Two years ago our Supreme Court affirmed the impropriety of such "fill-in-the-blank" arguments in *Emery*, 174 Wn.2d at 759-60. The court noted that "although the argument properly describes reasonable 'doubt as a doubt for which a reason exists,' it improperly implies that the jury must be able to articulate its reasonable doubt." *Emery*, 174 Wn.2d at 760 (internal quotation marks omitted). This "subtly shifts the burden to the defense," making it "inappropriate." *Emery*, 174 Wn.2d at 760.

No. 43218-8-II

The instruction here suffers from the same infirmity, which neither its passive construction nor its status as a preliminary instruction can cure. The addition to the instructions set out above tells the jury that it may acquit only if it has "a doubt for which a reason can be given," imposing the same requirement to articulate doubt found wanting in *Emery*, 174 Wn.2d at 760. The instruction also plainly implies that someone should be able to supply or articulate that reason. Since the State will avoid supplying reasons to doubt its own case, the instruction suggests that either the juror or the defendant should supply it, further undermining the presumption of innocence.

The *Emery* court's censure of the requirement to articulate a doubt is well anchored in both logic and the realities of making a decision. In examining this type of requirement, an article in the *Notre Dame Law Review* points out that

> [t]he need to assign a doubt implies that a generic doubt would be insufficient, such as "I doubt the prosecutor's case." Such a doubt would strike many hearers of the instruction as too broad or diffuse to be anything more than a mere doubt or a speculative doubt, and not one that "you can give a good reason for."
>
> . . . .
>
> A troubling conclusion that arises from the difficulties of the requirement of articulability is that it hinders the juror who has a doubt based on the belief that the totality of the evidence is insufficient. Such a doubt lacks the specificity implied in an obligation to "give a reason," an obligation that appears focused on the details of the arguments. Yet this is precisely the circumstance in which the rhetoric of the law, particularly the presumption of innocence and the state['s] burden of proof, require acquittal.

Steve Sheppard, THE METAMORPHOSES OF REASONABLE DOUBT: HOW CHANGES IN THE BURDEN OF PROOF HAVE WEAKENED THE PRESUMPTION OF INNOCENCE, 78 NOTRE DAME L. REV. 1165, 1213-14 (2003) (footnotes omitted). The article illuminates also how the requirement to articulate doubt potentially creates a barrier to acquit for less-educated or skillful jurors:

> If the juror is expected to explain the basis for a doubt, that explanation gives rise to its own need for justification. If a juror's doubt is merely, "I didn't think the

19

state's witness was credible," the juror might be expected to then say why the witness was not credible.

. . . .

A juror who lacks the rhetorical skill to communicate reasons for a doubt is then, as a matter of law, barred from acting on that doubt.

Sheppard, 78 NOTRE DAME L. REV. 1213.

Where, as here, the State's case depends on the credibility of a single witness, with little in the way of corroboration, the implication that a juror must "give a reason" for any doubt poses a particularly serious risk of undermining the State's burden. Under the rationale of *Emery*, the jury instructions at issue improperly shifted the burden of persuasion to the defendant.

The majority points out that the actual holding of *Emery* extended only to closing argument and argues that its rule consequently does not apply to the jury instructions here at issue. However, to a juror the gravitational field around the *ex cathedra* pronouncements of a judge is by its nature much stronger than that around the arguments of an advocate. Thus, if the requirement of articulability constituted error in the mouth of a deputy prosecutor, it would surely also do so in the mouth of the judge. The *Emery* court itself effectively recognized this. In declining to apply the constitutional harmless error standard, *Emery* noted that

closing argument cannot be likened to instructional error . . . [b]ecause jurors are directed to disregard any argument that is not supported by the law and the court's instructions, [and thus] a prosecutor's arguments do not carry the imprimatur of both the government and the judiciary.

*Emery*, 174 Wn.2d at 756-59 (internal quotation marks omitted). Here, the flawed instructions carried that imprimatur. They fall beneath the rationale of *Emery* even more surely than does the closing argument at issue in that decision.

Finally, there can be little contest whether this error affected a constitutional right. In reviewing an unpreserved claim involving inadequate reasonable doubt instructions, our

20

Supreme Court considered the "failure of the court to state clearly to the jury the definition of reasonable doubt and the concomitant necessity for the state to prove each element of the crime by that standard . . . a grievous constitutional failure." *State v. McHenry*, 88 Wn.2d 211, 214, 558 P.2d 188 (1977). More specifically, the court characterized the articulability requirement at issue in *Emery* as one that "touched upon the defendants' constitutional rights," after noting that it "could potentially have confused the jury about its role and the burden of proof." *Emery*, 174 Wn.2d at 763. Consistently with these holdings, the Supreme Court recognized in *State v. Bennett*, 161 Wn.2d 303, 315-16, 165 P.3d 1241 (2007), that the "reasonable doubt instruction defines the presumption of innocence," which is "the bedrock upon which the criminal justice system stands," and that the court, "as guardians of all constitutional protections, is vigilant to protect the presumption of innocence." The State's concession is correct that the instruction, if erroneous, amounts to a constitutional error.

B.      The instructional error was manifest under RAP 2.5(a).

A "manifest" error under RAP 2.5(a) is one resulting in "actual prejudice," namely "practical and identifiable consequences" at trial. *Gordon*, 172 Wn.2d at 676(internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99).

The *O'Hara* court clarified, however, that "to ensure the actual prejudice and harmless error analyses are separate, the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review." *O'Hara*, 167 Wn.2d at 99-100 (citing *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *City of Seattle v. Harclaon*, 56 Wn.2d 596, 597, 354 P.2d 928 (1960)). Thus, "to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to

21

ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 100.

Although plausible arguments may be raised on either side, the unadorned language of the challenged instruction offended the rationale behind *Emery*'s rejection of the articulability requirement in closing argument. In even plainer sight, the challenged instruction violated our Supreme Court's directive in *Bennett*, 161 Wn.2d at 318, that trial courts must "use the WPIC 4.01 instruction to inform the jury of the government's burden to prove every element of the charged crime beyond a reasonable doubt." As the court explained,

> [e]ven if many variations of the definition of reasonable doubt meet minimal due process requirements, the presumption of innocence is simply too fundamental, too central to the core of the foundation of our justice system not to require adherence to a clear, simple, accepted, and uniform instruction. We therefore exercise our inherent supervisory power to instruct Washington trial courts not to use the *Castle* instruction. We have approved WPIC 4.01 and conclude that sound judicial practice requires that this instruction be given until a better instruction is approved.

*Bennett*, 161 Wn.2d at 317-18. Divisions One and Two of our court had both held, prior to Kalebaugh's trial, that failure to strictly adhere to our Supreme Court's directive in *Bennett* constitutes error. *State v. Castillo*, 150 Wn. App. 466, 472, 208 P.3d 1201 (2009); *State v. Lundy*, 162 Wn. App. 865, 871, 256 P.3d 466 (2011), *appeal after remand*, 176 Wn. App. 96, 308 P.3d 755 (2013). Under *Bennett*, the error in the instructions challenged here could hardly be more manifest.[7]

---

[7] *Bennett*, admittedly, held that the prior *Castle* instruction at issue met minimal due process standards. The focus in *O'Hara*, though, is on whether error is manifest, not whether every ground of challenge is obvious.

The majority contends that the error cannot be manifest, because any error in the preliminary instruction was cured by the proper written instruction given prior to closing argument. However, the flawed instruction was among the first directions the jurors heard from the trial court about the case and was not corrected until after all the evidence had been heard. Thus, as they heard the evidence, this instruction was all the jury had before it on *how* it was to weigh evidence. It fitted each juror with a distorted lens through which to view and weigh the evidence as it was presented.

Even more to the point, the difference between the erroneous articulability requirement in the first instruction and the correct statement that "a reasonable doubt is one for which a reason exists" is subtle enough that many jurors would likely not take the proper statement as rescinding or qualifying the erroneous one. Compare VRP (Jan. 3, 2012) with 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 1.01 at 3, 4.01 at 85 (3d ed. 2008). The improper demand to articulate a reason can live quite comfortably with the requirement that a reason must exist. The correct instruction cured nothing.[8]

Kalebaugh alleges a manifest error affecting a constitutional right. Accordingly, we must reach it under RAP 2.5(a).

II. THE INSTRUCTIONAL ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT.

The analysis under RAP 2.5(a), above, disposes of the threshold question on the merits: the challenged instruction was constitutionally erroneous. This leaves only the question whether the error was harmless.

---

[8] The Connecticut cases cited by the majority persuade neither that the preliminary instruction here did no harm nor that the written instruction removed that harm.

Trial error of constitutional magnitude gives rise to a presumption of prejudice, and "the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). As shown above, the error here was of constitutional magnitude.

*Emery*, however, the Washington decision treating the most similar error, did not apply this standard, but rather followed the customary standard for prosecutorial misconduct to which no objection was raised: the defendant must show that the remarks were so flagrant and ill-intended that an instruction could not have cured the prejudice. *Emery*, 174 Wn.2d at 760-61. In giving its reasons for applying this standard, though, the court draws a sharp distinction between closing argument and jury instructions:

> Finally, closing argument cannot be likened to instructional error. Because jurors are directed to disregard any argument that is not supported by the law and the court's instructions, a prosecutor's arguments do not carry the imprimatur of both the government and the judiciary.

*Emery*, 174 Wn. 2d at 759 (internal quotation marks omitted). As already noted, the flaw before us is instructional error, carrying the "imprimatur of both the government and the judiciary." Thus, the very reason for rejecting the constitutional harmless error standard in *Emery* compels its adoption here. The conviction must be reversed unless the State proves it harmless beyond a reasonable doubt.

The evidence and argument fall far shy of this mark. The jury received the evidence at trial through a filter that distorted how they were to evaluate that evidence. Only after all evidence had been presented were they given the correct instruction, one with so subtle a difference from the flawed instruction as to rob it of any curative influence. One of the law's

24

finest and most urgent balances rests between convicting the guilty and acquitting the innocent. In these scales the central counterweight to the prerogatives of the prosecution is the requirement that it prove guilt beyond a reasonable doubt. When that requirement is undermined, a just and proper result is more the product of fortune, not reason. The error here was not harmless beyond a reasonable doubt.

CONCLUSION

While I agree with the majority's analysis concerning the sufficiency of the evidence, I would reverse Kalebaugh's conviction due to the error in the instruction on reasonable doubt.

BJORGEN, J.