IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38468-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SCOTT S. MANINA, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Scott Manina appeals convictions for rape, first degree child molestation, and second degree child molestation. Because sufficient evidence sustains his conviction for rape and his two convictions for first degree child molestation, we affirm those three convictions. We reverse his second degree child molestation conviction for lack of evidence. We reject Manina's alternate contentions of prosecutorial misconduct and ineffective assistance of counsel.

FACTS

Because Scott Manina challenges the sufficiency of the evidence to sustain his convictions, we purloin the facts from trial testimony. We relay those facts in the light most favorable to the State.

This prosecution arises from Scott Manina's sexual contact with his daughter. Scott and Rebecca Manina married in 2002 and divorced in 2018. We refer to Scott Manina as Manina and Rebecca Manini as Rebecca. Rebecca entered the marriage while pregnant with one child from a previous relationship. We give this child the pseudonym

"Ralph." The couple begot another son and a daughter, on whom we bestow the pseudonyms "Steven" and "Jane." Jane, the alleged victim of the crimes, was born on March 30, 2007. By the time of the first sexual assaults, at age ten, she had received no sex education at school.

In March 2018, when Scott and Rebecca Manina separated, Manina vacated the family home and moved into a recreational vehicle. Manina parked the recreational vehicle at a recreational vehicle park. Although Manina owned rental homes in Spokane at that time, tenants occupied all of those homes. Two months later, Manina moved into one of his rental homes. All three children occasionally visited him and stayed overnight at both the recreational vehicle and the rental home.

During March and April of 2018, when Scott Manina occupied the recreational vehicle, Jane suffered from rawness in her vagina. On instruction from her mother, Jane applied Vaseline to soothe the irritated area. Rebecca Manina taught Jane to apply the Vaseline by herself. Rebecca notified Manina of Jane's need to apply Vaseline to treat the rawness.

When Jane needed to spread the Vaseline while visiting Scott Manina at the recreational vehicle, he insisted on applying the ointment to her vagina. At Manina's instructions, Jane laid on her back on Manina's bed, she lifted her legs, and he spread the legs. Manina positioned himself in front of Jane such that he stood in between her legs at

2

the edge of the bed.  Manina placed Vaseline on his finger and inserted his finger with the

Vaseline into Jane's vagina.

At trial, Jane testified:

Q  (By Mr. Martin) Well, do you differentiate on your own body
between the outside of your vagina and the inside of your vagina?
A  What?
Q  Are those two different places for you?
A  Yeah.
Q  Okay.  When your father was applying the Vaseline like you just
described, would he put it on the inside, put it on the outside or something
else?
A  Inside.
Q  And is that how you, yourself, would use it when you were trying
to treat yourself by putting it inside?
A  Yeah.

Report of Proceedings (RP) (July 14, 2021) at 80-81.  Jane added:

Q  How—and this is going to sound like a weird question.  Just do
your best.  How did you know his finger was on the inside of your vagina
when he was putting the Vaseline on you?
A  I could feel it.

RP (July 14, 2021) at 83.  According to Jane, her father took longer to apply the Vaseline

than she did.

When the three children visited Scott Manina at the recreational vehicle, he

directed his sons to shower using the park's shower facilities.  Manina required that Jane,

who turned 11 years of age at the end of March 2018, shower in the recreational vehicle.

Manina insisted on helping Jane bathe, although Jane needed no assistance.  While

washing Jane with a washcloth, Manina touched her "bottom," "privates," and "breasts."

3

RP (July 14, 2021) at 70. When he reached Jane's breasts and vagina, he "grab[ed] [them] a little." RP (July 14, 2021) at 72. Jane felt her father's hands through the washcloth when he washed her vagina. Manina spent more time washing the vaginal region than other body parts. Manina's behavior rendered Jane "uncomfortable." RP (July 14, 2021) at 70, 77.

At the rental home, Jane needed Scott Manina to turn on the shower water because of a stuck faucet. Manina turned the water on only after Jane undressed. If Jane remained dressed when Manina responded to her request for help, he left the bathroom and waited for her to undress before assisting her. Manina did not allow Jane to cover herself with a towel or robe while she waited. On one or more occasions after he turned the water on, and before he left the bathroom, Manina gave Jane a hug while she was naked. He wrapped his arms around her neck and moved his hands down to her "bottom." Manina left his hand on the bottom until Jane broke contact.

Jane suffered from bacterial vaginitis, a bacterial infection in the vagina that causes irritation. Women who have yet to menstruate or are not sexually active rarely contract bacterial vaginitis. In September 2018, Jane told her mother of an odor emanating from her vagina. Rebecca took Jane to a pediatrician, whose testing confirmed bacterial vaginitis and a yeast infection. The pediatrician prescribed an antibacterial cream for external application on Jane's labia majora, the outer part of her

vagina, and demonstrated to Jane how to spread the cream. Jane applied the cream on her own while under Rebecca's care.

Jane's pediatrician suspected someone touched Jane inappropriately because girls of Jane's age, who had yet to start periods, generally did not contract bacterial vaginitis. The pediatrician recommended Rebecca Manina call Partners with Families and Children (Partners), who works with Child Protection Services (CPS). When Rebecca told Scott Manina that the pediatrician recommended contacting Partners, he said no.

When Jane notified Scott Manina she needed to apply the external antibacterial cream to her vagina, the father insisted on spreading the cream despite Jane stating she could do so on her own. Although the cream was intended only for external application, Manina applied it to both the inside and outside of his daughter's vagina. Manina employed the same process to smear the prescription cream as he used to apply the Vaseline. Jane did not wear underwear or pants when Manina dispersed the medicated cream. The father applied the cream "internally" with his finger, which rendered Jane uncomfortable. RP (July 14, 2021) at 94.

Jane experienced bacterial vaginitis again in early 2019, so Rebecca Manina scheduled a gynecologist appointment for Jane for March 19, 2019. Nurse practitioner Jennifer Julian examined Jane and diagnosed bacterial vaginitis. Julian also prescribed an antibacterial cream for external use and showed Jane how to apply it.

5

Jane engaged in a follow-up appointment with Jennifer Julian on April 2, 2019. Both Rebecca and Scott Manina attended and accompanied Jane into the examination room. Julian concluded Jane still struggled with bacterial vaginitis, so the gynecologist nurse practitioner prescribed a different antibacterial cream intended for internal application and showed Jane how to insert the cream with an applicator. Julian did not recommend that either parent apply the antibacterial cream. The practitioner would not advise a father of an 11- to 12-year-old girl to apply the cream.

On one occasion in the spring of 2019, Scott Manina allowed Jane, then age 12, to apply the internal cream on her own, but he held a mirror in front of Jane to assist in the application. Jane saw her father's reflection in the mirror. She felt discomfort when she noticed him looking at her vagina.

Scott Manina treated Jane differently from his sons, Ralph and Steve. Manina, to Jane's discomfort, showed physical affection to her. The father often wrapped his arm around Jane and placed his hand on her leg. Manina punished Jane less severely than her brothers.

According to Ralph, the father treated Jane like the princess of the house. On one occasion, Scott Manina shattered his sons' light sabers because one boy accidently struck Jane with the saber. The father did not want his princess harmed. The father would always sit next to Jane when the children visited. He would lay by Jane on the couch with his arm around her. On one occasion, Ralph observed his father caressing his

sister's thigh.

Jane returned to nurse practitioner Jennifer Julian on April 16, 2019. Only Rebecca attended this appointment with Jane. Jane reported difficulty in applying the internal cream, so the gynecologist prescribed an oral medication as a replacement.

On July 2, 2019, Jane, with her mother, went to Jennifer Julian's office again because of continuing bacterial vaginitis. Midwife Mashid Aghasadeghi examined Jane on this visit. After examining Jane, Aghasadeghi, a mandatory reporter, told Rebecca Manina that she intended to call CPS because of information shared by Jane. Aghasadeghi made the call.

Before the report to CPS, clinical psychologist Michelle Estelle assisted Jane in adjusting to her parents' divorce. Estelle also then counseled Scott Manina. After hearing about the allegations of abuse, Estelle ceased seeing Manina, but continued to counsel Jane.

In July 2019, CPS referred Jane to pediatric nurse practitioner Teresa Forshag to review "possible grooming behavior and possible sex abuse by the father." RP (July 19, 2021) at 284. At trial, Teresa Forshag lectured on the anatomy of a vagina. Forshag described the labia majora as the "fleshy" lips "on the outside" of the vagina and the labia minora as the "thinner" lips on the "inside" of the vagina. RP (July 19, 2021) at 276-77. Forshag indicated that women who have started their period and who have become sexually active are more susceptible to contracting bacteria vaginitis than women who

have yet to menstruate or become active.

PROCEDURE

The State of Washington charged Scott Manina with one count of first degree rape of a child, two counts of first degree child molestation, and one count of second degree child molestation. The State alleged rape occurred between March 1, 2018 and May 31, 2018, when Manina, in the recreational vehicle, inserted his finger into Jane's vagina. The first count of child molestation allegedly occurred between March 1, 2018 and May 31, 2018, and the second charge of child molestation transpired between June 1, 2018 and March 29, 2019. The State alleged second degree child molestation occurred between March 30, 2019 and July 18, 2019.

During the State's opening statement, the State's attorney intoned:

> [B]y the time that you've heard all the evidence in this case, you'll see that that evidence shows that the defendant, Scott Manina, had a sexual attraction to his own 11 and 12 year old daughter that he took every chance he could to express his affection toward her, and once he and his wife Rebecca Manina split, that he took every opportunity he could get to put his hands on his own daughter, on her private areas, on areas that she should have been able to keep away from him, from his sight and from his touch.

Supplemental Report of Proceedings (Supp. RP) at 3. The prosecuting attorney also commented about Manina purportedly lurking behind the shower curtain while Jane showered.

During trial, the trial court entertained testimony from Theresa Forshag, outside the presence of the jury, to determine admissibility of some of the evidence. The State

wished to solicit testimony from Forshag as to the history of abuse shared by Jane. Scott

Manina's counsel conducted a voir dire examination of Forshag before the court ruled on

the testimony's admissibility. The following exchange occurred:

> Q How were the statements that [Jane] made to you, the ones you just related to us, relevant to you in terms of providing care for her?
> A So those kinds of behaviors by a parent are very concerning for grooming kinds of behaviors. So that makes me worry about safety for the child.

RP (July 19, 2021) at 297.

During trial, the following exchange occurred between psychologist Michelle

Estelle and the prosecution:

> Q Have you ever done any kind of research into grooming behavior that a person who might commit sexual assault on his daughter might use–
> A Mm-hmm.
> Q —to make the sexual assaults easier to accomplish?
> A Yes, I'm aware.
> Q And getting a child used to physical touch so it's not as shocking to them is a type of grooming behavior; is that true?
> A That is true.
> Q And children who are taught to follow orders I guess without much question, also, be a type of grooming behavior, yes?
> A It could be.
> Q Would you agree in terms of grooming that a child who has been groomed may actually appear to enjoy spending time with their abuser?
> A I'm not an expert in that area. So I mean, I would probably not be the best person to ask that specific question.

RP (July 20, 2021) at 636-37.

The trial court, in an incomplete sentence, instructed the jury on the medical

purpose exception to sexual intercourse. Jury instruction 10 read:

"Sexual intercourse" means any penetration of the vagina, however slight, by an object, including a body part, when committed on one person by another, whether such persons are of the same or opposite sex. Except when such penetration is accomplished for medically recognized treatment or diagnostic purposes.

Clerk's Papers (CP) at 105. The trial court also instructed the jury that statements by lawyers are not evidence.

In his closing argument, the prosecutor stated:

You heard from [Jane's] counselor a little bit about what she was talking about with grooming, and that is one of the things she testified can be a sign of trying to make a child used to being touched in a way maybe she shouldn't be touched.

RP (July 21, 2021) at 698.

The jury convicted Scott Manina on all four charges.

LAW AND ANALYSIS

On appeal, Scott Manina asserts that insufficient evidence supported each of his convictions such that we should reverse and dismiss all charges. In the alternative, he contends that the prosecutor committed misconduct when introducing evidence and arguing about grooming. We address these assignments of error in such order.

Sufficiency of Evidence

We delineate familiar principles for reviewing the sufficiency of evidence for a criminal conviction. We view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found the essential elements of the

10

charged crime beyond a reasonable doubt. *State v. Embry*, 171 Wn. App. 714, 742, 287

P.3d 648 (2012). Sufficiency challenges admit the truth of the State's evidence and all

reasonable inferences drawn from it. *State v. Embry*, 171 Wn. App. 714, 742 (2012).

This court does not review the trier of fact's determinations on credibility and defers to

the trier of fact with respect to conflicting testimony and the persuasiveness of evidence.

*State v. Embry*, 171 Wn. App. 714, 742 (2012).

*Rape of a Child*
*Vaginal Penetration*

We address the sufficiency of evidence of each conviction separately beginning

with rape of a child in the recreational vehicle. Scott Manina asserts two contentions

when challenging his conviction for rape. He contends the State failed to provide

sufficient evidence establishing the element of penetration of Jane. He also argues that

he fulfilled the medical exception to the crime.

According to Scott Manina, the State did not prove the penetration element of first

degree rape of a child because the trial court never defined the word "vagina" for the

jury. According to Manina, the definition of "vagina" found in *State v. Delgado*, 109

Wn. App. 61, 66, 33 P.3d 753 (2001), *rev'd in part*, 148 Wn.2d 723, 63 P.3d 792 (2003)

includes the labia minora, but does not include the labia majora. Manina then emphasizes

the testimony of Theresa Forshag distinguishing between the labia majora and minora

and highlights that Forshag never averred that Jane told her that Manina invaded inside

11

the labia minora. Manina recognizes that Jane testified that he inserted his finger "inside" her, but maintains Jane lacked schooling as to the various parts of the vagina or sex education such that we cannot be certain that she testified to penetration of the labia minora.

We fault the reasoning of Scott Manina. The inclusion of the labia minora in the definition of "vagina" in one Washington decision does not exclude the addition of the labia majora within the definition. The jury did not need to rely solely on Theresa Forshag's testimony as to the report by Jane. The jury could also rely on Jane's testimony to convict Manina. When arguing that Jane lacked an education sufficient to describe penetration inside the vagina, Manina fails to view the evidence in a light favorable to the State.

We quote relevant statutes. Under RCW 9A.44.073(1):

> A person is guilty of rape of a child in the first degree when the person has *sexual intercourse* with another who is less than twelve years old and the perpetrator is at least twenty-four months older than the victim.

(Emphasis added.) RCW 9A.44.010(14) declares, in relevant part:

> "Sexual intercourse" (a) has its ordinary meaning and occurs upon any penetration, however slight, and
> (b) Also means any *penetration of the vagina* or anus *however slight*, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes.

(Emphasis added.)

12

We surmise that an exploration of the meaning of the word "vagina" or a survey of the geography of the female sex organ leads to an unnecessary detour. Regardless of whether the word encompasses the labia majora, sufficient evidence supports the conviction of rape. We explore the meaning of "vagina" anyway to thoroughly address Scott Manina's contentions.

Scott Manina insists that the evidence at most established penetration of Jane's labia majora. The labia majora consists of two rounded folds of adipose tissue extending downward and backward from the mons pubis. *Kackley v. State*, 63 Md. App. 532, 493 A.2d 364, 366 (1985). Within the labia majora are two flat, reddish folds of tissue that encase the clitoris clinically known as the labia minora. *Kackley v. State*, 493 A.2d 364, 366 (1985). The labia minora constitutes the two thin inner folds of skin within the vestibule of the vagina enclosed within the cleft of the labia majora. *State v. Montgomery*, 95 Wn. App. 192, 200-01, 974 P.2d 904(1999).

Rape, under the Washington code, encompasses the "vagina" or anus. The Washington criminal code not define "vagina." Two Washington decisions hold that, for purposes of RCW 9A.44, "vagina" means "all of the components of the female sexual organ" and "the labia minora are part of the definition of vagina." *State v. Delgado*, 109 Wn. App. 61, 66 (2003); *State v. Montgomery*, 95 Wn. App. 192, 200 (1999). Scott Manina seizes on the mention of the "labia minora" in the definition to contend that the statutory word "vagina" excludes the labia majora. We disagree. Manina reads only half

13

of the decisional definition of "vagina."  The definition also includes "all of the components of the female sexual organ."  According to other decisions, "vagina" means all of the components of the female sexual organ and not just the passage leading from the opening of the vulva to the cervix of the uterus.  *State v. Weaville*, 162 Wn. App. 801, 813, 256 P.3d 426 (2011); *State v. Montgomery*, 95 Wn. App. 192, 200 (1999).  In *State v. Montgomery* and *State v. Delgado*, this court did not answer whether the labia majora also constituted part of the vagina.

Other Washington cases indirectly explore the meaning of "vagina" for purposes of Washington's rape crime.  The crime of rape seeks to distinguish between penetration and mere contact with the sexual organ, which does not suffice.  *State v. Snyder*, 199 Wash. 298, 301, 91 P.2d 570 (1939).  Penetration need not be perfect.  *State v. Snyder*, 199 Wash. 298, 301 (1939).  The slightest penetration of the body of the female suffices.  *State v. Snyder*, 199 Wash. 298, 301 (1939).  The accused need not enter the vagina or rupture the hymen; the entering of the vulva or labia is sufficient.  *State v. Snyder*, 199 Wash. 298, 301 (1939).  This latter principle does not distinguish between the labia minora and majora.

In *State v. Snyder*, 199 Wash. 298 (1939), the Supreme Court affirmed a conviction based on the child's testimony that only the lips of her sexual organ had been penetrated.  We note, however, that, in 1939, the Washington statute did not employ the

14

word "vagina," and only read that "sexual penetration, however slight" constituted "sexual intercourse." REM. REV. STAT. § 2437.

One foreign decision confirms that the entry of the labia majora qualifies for rape, although the relevant state statute, like the former Washington statute, defined "rape" as "penetration, however slight" without mentioning the vagina. *Kackley v. State*, 493 A.2d 364, 366 (1985). Invasion of the labia majora, however slight, is sufficient to establish penetration. *Kackley v. State*, 493 A.2d 364, 366 (1985).

We add other principles to our review of the sufficient evidence of rape by Scott Manina of Jane. The victim's testimony may supply the proof of penetration. *Kackley v. State*, 493 A.2d 364, 367 (1985). The victim need not supply sordid detail to effectively establish that penetration occurred during the course of a sexual assault. *Kackley v. State*, 493 A.2d 364, 367 (1985). The courts are normally satisfied with descriptions which in light of all surrounding facts, provide a reasonable basis from which to infer that penetration has occurred. *Kackley v. State*, 493 A.2d 364, 367 (1985).

Whether sexual penetration occurred is a question of fact to be determined by the jury. *People v. Janusz*, 2020 IL App (2d) 190017, 162 N.E.3d 1027, 1038, 443 Ill. Dec. 876. The Illinois statute prohibits penetration of the "sex organ," but a state court ruled that a victim's testimony that the defendant "touched" and "poked" her vagina was evidence from which a reasonable jury could infer sexual penetration by the defendant's finger. *People v. Foster*, 2020 IL App (2d) 170683, ¶¶ 32-36, 156 N.E.3d 1118 , 441 Ill.

Dec. 369. In *People v. Janusz*, 162 N.E.3d 1027, the court held the testimony sufficient when the child testified that the defendant touched her "inside" and "outside" with his hand. In *People v. Gonzalez*, 2019 IL App. (1st), 142 N.E.3d 253, 436 Ill. Dec. 369, the victim testified that the defendant "pushed" in her vagina.

Scott Manina directed Jane to lay on the bed, to lift her legs into the air, and to spread the legs. Jane expressly stated that she knew the difference between the outside and the inside of her vagina. She added that she felt her father's finger inside. Even if Jane lacked full understanding of the female genitalia, this testimony sufficed.

*Rape of a Child*
*Medical Exception*

Scott Manina next argues that, even if the State proved penetration, the statutory exception for medical treatment shielded him from criminal responsibility for the charge of first degree rape of a child. The rape statute excuses Manina's fingering the vagina if done "for medically recognized treatment or diagnostic purposes." RCW 9A.44.010(14)(b).

Scott Manina asserts that his former wife Rebecca never informed him about the need for Jane to apply Vaseline or medicated cream, that he did not know Jane could spread the creams without assistance, that he saw his child in pain, and that he was a family man who attended church. He characterizes his touching of Jane's genitalia as caretaking. He does not cite the record for these factual assertions. He provides no

16

analysis beyond this recap of purported facts.  We deem being a family man and church

attendance unimportant to a charge of rape, but the trial testimony did not support such

practices or that he sought to attend to his daughter's pain.  Manina did not testify.

The trial court instructed the jury on the medical exception.  Scott Manina may

argue that the State, under the undisputed testimony, failed to disprove the exception, but

we disagree.  Jane could apply and insert the Vaseline and cream without assistance.

Manina volunteered to administer the cream.  From this and other testimony, a reasonable

jury could conclude that Manina did not assist for medicinal purposes.

*First Degree Child Molestation*

Scott Manina argues that the evidence failed to establishment the elements of

sexual contact and sexual gratification for purposes of both the first degree and second

degree child molestation convictions.  RCW 9A.44.083(1) reads:

> A person is guilty of child molestation in the *first degree* when the
> person has, or knowingly causes another person under the age of eighteen
> to have, *sexual contact* with another who is *less than twelve years old* and
> the perpetrator is at least thirty-six months older than the victim.

(Emphasis added.)  RCW 9A.44.086(1) declares:

> A person is guilty of child molestation in the *second degree* when
> the person has, or knowingly causes another person under the age of
> eighteen to have, *sexual contact* with another who is *at least twelve years*
> old but less than fourteen years old and the perpetrator is at least thirty-six
> months older than the victim.

(Emphasis added.)  RCW 9A.44.010(13) provides:

17

"Sexual contact" means any *touching* of the sexual or other *intimate parts* of a person done for the purpose of *gratifying sexual desire* of either party or a third party.

(Emphasis added.)

Although courts sometimes conflate the two elements of sexual contact for purposes of child molestation, the discrete elements are: (1) touching of a sexual or other intimate body part, and (2) touching for the purpose of sexual gratification. *In re Welfare of Adams*, 24 Wn. App. 517, 519, 601 P.2d 995 (1979). As to the first element, if a contact is directly to the genital organs or breasts, the court on appeal may resolve the question of a sexual part of the body as a matter of law. *In re Welfare of Adams*, 24 Wn. App. 517, 519 (1979). Nevertheless, the State, to convict, need not establish the accused's touching of an erogenous part such as the vagina, penis, or breast. RCW 9A.44.010(13) mentions both sexual parts and intimate parts. The term "intimate parts" is broader in connotation than the term "sexual parts." *In re Welfare of Adams*, 24 Wn. App. 517, 519 (1979). Contact is "intimate" within the meaning of the statute if a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper. *State v. Jackson*, 145 Wn. App. 814, 819, 187 P.3d 321 (2008). A jury may determine that parts of the body in close proximity to the primary erogenous areas are intimate parts. *State v. Harstad*, 153 Wn. App. 10, 21, 218 P.3d 624 (2009).

Whether an area other than genitalia and breasts are intimate is a question to be resolved by the trier of the facts. *State v. Jackson*, 145 Wn. App. 814, 819 (2008); *In re Welfare of Adams*, 24 Wn. App. 517, 520-21 (1979). In determining whether sexual contact occurred, this court considers the totality of the facts and circumstances presented. *State v. Harstad*, 153 Wn. App. 10, 21, (2009). In *In re Welfare of Adams*, this court ruled that, under the totality of the circumstances, hips could be considered intimate parts for purposes of the child molestation statute.

The State identified the first count of first degree child molestation, count II in the information, as the washing of the vagina in the recreational vehicle shower between March 1, 2018 and May 31, 2018. As to this charge, Scott Manina focuses his attack on the lack of sexual gratification, rather than touching of a sexual or intimate part. Manina characterizes his conduct of washing Jane's body as reasonable caretaking that lacked any motivation for sexual gratification.

The evidence is not as simple as suggested by Scott Manina. Manina allowed his sons, but not Jane, to shower in the recreational vehicle park facilities. Fathers do not wash a ten-year-old daughter, when the daughter is physically capable of doing so herself. Manina directed Jane to spread her legs while she washed her legs. Manina washed Jane's buttocks, vagina, and breasts. The father grabbed Jane's vagina and breasts, in addition to washing her intimate parts. Manina lingered in the shower and

19

took more time than was necessary to wash Jane's body. The jury could rationally infer Manina performed these actions for his own sexual gratification.

Count III in the information alleged first degree child molestation resulting from the conduct of Scott Manina in the rental home between June 1, 2018 and March 29, 2019. According to Jane, Manina placed his hands on her bottom. Manina emphasizes the lack of the caress of an intimate area and his speaking to Jane about her day in school while assisting her in the shower. He impliedly argues that he did not touch an intimate or sexual part.

Scott Manina ignores powerful evidence of touching of an intimate part and sexual gratification. Assuming the bottom or buttocks does not constitute a sexual part, the buttocks qualifies as an intimate part as established by thighs being intimate parts. The jury could also find sexual gratification. After Manina started the shower water, he did not need to linger in the bathroom. Instead, he insisted that Jane disrobe before he began the water. Manina embraced Jane as she was naked. He cupped her bottom. Jane needed to retreat to be released from his hold.

*Second Degree Child Molestation*

The single difference between first degree child molestation and second degree child molestation concerns the age of the victim. The victim must be below the age of twelve years for first degree molestation. Conversely, the victim must be at least twelve years of age for second degree molestation.

20

The State based count IV, second degree child molestation, on conduct occurring in Scott Manina's rental home between March 30, 2019 and July 18, 2019. On April 2, 2019, Manina allowed Jane to spread the antibacterial cream on her own. Nevertheless, he held a mirror to purportedly assist her in the application.

Scott Manina argues that insufficient evidence supports his conviction for second degree child molestation because he did not engage in any touching during the mirror incident or at any time after Jane reached the age of twelve. We agree.

The State suggests that on the occasion of the use of the mirror, Scott Manina applied some of the cream. The record does not support this factual assertion. To repeat, RCW 9A.44.010(13) demands touching of intimate parts for the sexual gratification.

In *State v. Brooks*, 45 Wn. App. 824, 727 P.2d 988 (1986), Chuck Brooks argued that, because the definition of "sexual contact" for purposes of RCW 9A.44 identifies that a touching must occur, and because no direct evidence established that such touching took place, his conviction for indecent liberties could not be sustained. This court recognized that the statute does not require direct contact. Semen was found on the child's body. In Scott Manina's prosecution, law enforcement and health care providers found none of Manina's bodily fluids on Jane.

Prosecutorial Misconduct

Scott Manina complains that the trial deputy prosecutor engaged in prosecutorial misconduct. Manina assigns error to the State's eliciting inadmissible grooming

testimony and giving improper opening and closing arguments that inferred Manina

engaged in grooming behaviors. He contends that, because some of the examples of

grooming described by Jane, Ralph, and Theresa Forshag resembled his conduct, the jury

likely drew an unwarranted inference of guilt.

The defendant bears the burden of proving prejudicial prosecutorial misconduct.

*State v. Furman*, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993). If the defendant establishes

improper conduct, the prosecutorial misconduct does not merit reversal unless this court

discerns a substantial likelihood the misconduct affected the jury's verdict. *State v.*

*Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997); *State v. Molina*, 16 Wn. App. 2d

908, 918, 485 P.3d 963 (2021), *review denied*, 198 Wn.2d 1008, 493 P.3d 731 (2021).

Scott Manina's trial counsel did not object to the introduction of the evidence

being challenged on appeal as prosecutorial misconduct. A defendant's failure to object

to a prosecuting attorney's improper remark constitutes a waiver of such error, unless the

remark is deemed so flagrant and ill-intentioned that it evinces an enduring and resulting

prejudice that could not have been neutralized by an admonition to the jury. *State v.*

*Stenson*, 132 Wn.2d 668, 719 (1997); *State v. Gentry*, 125 Wn.2d 570, 596, 888 P.2d

1105 (1995).

Scott Manina contends that grooming testimony constituted inadmissible profile

testimony. "As a general rule, profile testimony that does nothing more than identify a

person as a member of a group more likely to commit the charged crime is inadmissible

owing to its relative lack of probative value compared to the danger of its unfair prejudice." *State v. Braham*, 67 Wn. App. 930, 936, 841 P.2d 785 (1992). Nevertheless, although grooming testimony is discouraged, it is not absolutely barred. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018). A court must analyze, on a case-by-case basis, the admissibility of grooming evidence. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 167 (2018).

Although Scott Manina contends the State elicited improper grooming testimony from Jane, he supplies no citation to the record identifying such testimony. Nor does he analyze any purported grooming testimony from Jane.

Scott Manina complains that Ralph's testimony accused him of grooming. According to Ralph, the father treated Jane like the princess of the house. On one occasion, Manina destroyed his sons' light sabers because one boy accidently struck Jane with the saber. The father always sat next to Jane when the children visited. He would lay by Jane on the couch with his arm around her. On one occasion, Ralph observed his father caressing his sister's thigh.

We do not discern Ralph's testimony as grooming in nature. The evidence posed relevance to the father's intent to molest Jane and sought to rebut Scott Manina's claim that he engaged only in reasonable caretaking. ER 404(b). Ralph did not use the word groom. He did not suggest his father catered to Jane leading up to his molestations.

Scott Manina characterizes testimony given by Rebecca Manina, when Rebecca explained that Manina punished Jane less harshly than her brothers, as grooming testimony. For the same reason that we disagree with Ralph's testimony being grooming in nature, we also conclude Rebecca's testimony to lack this character.

Scott Manina next highlights two excerpts from Theresa Forshag's testimony. The first excerpt reads:

> I was referred to the child due to concerns for possible grooming behavior and possible sex abuse by the father. I note several sentences into this that I have a CPS intake and the number. It's not clear to me whether I–how far in advance I had that, but I did have it at the time that I wrote the report.

RP (July 19, 2021) at 284. In this passage, Forshag did not opine that Manina engaged in grooming. Instead, Forshag identified her purpose for treating Jane. She never later opined that grooming occurred.

Scott Manina also complains of testimony from Teresa Forshag that the history given to her by Jane helped her to consider grooming behavior. Nevertheless, this testimony occurred during a voir dire examination outside the presence of the jury.

Scott Manina objects to the following exchange between the prosecution and counselor Michelle Estelle:

> Q Have you ever done any kind of research into grooming behavior that a person who might commit sexual assault on his daughter might use—
> A Mm-hmm.
> Q —to make the sexual assaults easier to accomplish?
> A Yes, I'm aware.

24

Q And getting a child used to physical touch so it's not as shocking to them is a type of grooming behavior; is that true?
A That is true.
Q And children who are taught to follow orders I guess without much question, also, be a type of grooming behavior, yes?
A It could be.
Q Would you agree in terms of grooming that a child who has been groomed may actually appear to enjoy spending time with their abuser?
A I'm not an expert in that area. So I mean, I would probably not be the best person to ask that specific question.

RP (July 20, 2021) at 636-37. We decline to hold this passage to be prosecutorial misconduct. To repeat, some grooming testimony is permissible such that the State's questioning about grooming likely does not rise to the level of flagrant misconduct, let alone improper conduct. Although Estelle mentioned that some adults may engage in innocent touching in order to prepare a child for sexual contact, she did not confirm the opinion that the State desired her to confirm. Estelle did not opine that Manina engaged in such conduct.

Scott Manina next complains about references to grooming behavior in the State's opening and closing statements. Statements made in opening and closing arguments are not evidence, and the jury was instructed on this. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 172 (2018).

Under the guise of an assignment of prosecutorial misconduct, Scott Manina contends the State admitted evidence of "lustful disposition." He cites the Washington Supreme Court's recent decision in *State v. Crossguns*, 199 Wn.2d 282, 294, 505 P.3d

25

529 (2022) for the proposition that the State may no longer accuse the defendant of a lustful disposition. In *Crossguns*, the Supreme Court instructed the State to discontinue the use of the label, but the court did not preclude admission of this type of evidence under ER 404(b).

We reject Scott Manina's attempt to gain a new trial based on *State v. Crossguns* for several reasons. Manina did not object at trial to admission of the evidence that he now suggests implied a lustful disposition. Also, the State never employed the term lust, disposition, or lustful disposition when presenting and reviewing the case for the jury. Testimony of Manina's special treatment and other touching of Jane was admissible to show motive and intent to rebut Manina assertion that his touching was proper caretaking by a father.

We agree with Scott Manina that, contrary to the State's opening statement, the State never provided testimony of Manina lurking behind the shower curtain. Nevertheless, during an opening statement, a prosecutor may state what the State's evidence is expected to show. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality opinion). Opening statements are reviewed permissively because, perhaps obviously, the evidence has yet to be presented. *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.3d 929 (1984). We have no reason to disbelieve that the State's attorney expected such testimony at trial.

Scott Manina also contends that his trial counsel performed ineffectively when failing to object to grooming testimony or to the argument by the State's attorney regarding grooming and a lustful disposition. Based on our analysis that the State's attorney did not commit misconduct, we conclude defense trial counsel did not perform inadequately.

Scott Manina argues that he suffered cumulative error. Since we hold that no error occurred, we do not discuss the cumulative error doctrine.

CONCLUSION

We reverse Scott Manina's conviction for second degree child molestation and remand for dismissal of the one charge. We affirm Manina's conviction for child rape and his two convictions for first degree child molestation.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____          _____
Siddoway, J.                                       Lawrence-Berrey, J.

27