218 P.3d 624 (2009)
STATE of Washington, Respondent,
v.
Ronald Dean HARSTAD, Appellant.
No. 61734-6.
Court of Appeals of Washington, Division 1.
August 24, 2009.
Publication Ordered October 16, 2009.
*626 Christopher Gibson, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
Andrea Ruth Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.
AGID, J.
¶ 1 A jury convicted Ronald Harstad (Harstad) of molesting two of his son's girlfriend's children, indecent exposure, and felony communication with a minor for immoral purposes. Because evidence that he touched the girls' upper inner thighs while rubbing and moving his hand back and forth and breathing heavily sufficiently establishes contact with intimate parts for a sexual purpose and his other claims are without merit, we affirm his judgment and sentence.

FACTS
¶ 2 B, Su, and Sh are sisters.[1] Their father, Toby Johnson, was often absent because he was incarcerated.[2] While Johnson was in prison from January 2001 to August 2006, the girls' mother, Cindy Kuether, began dating Harstad's son, Todd. After Kuether and the girls were evicted from their home, they stayed with Harstad and Todd in a small trailer in North Seattle. When Harstad moved to a house, Todd, Kuether, and the girls stayed there as well. At both the trailer and the house, there was not enough room for everyone, so the girls often slept on the living room couch.
¶ 3 Johnson was transferred from prison to work release in August 2006. Christina Dick, the girls' cousin, would pick up B and Sh from Harstad's house and take them to visit their father. Toward the end of one visit, B volunteered that she did not want to go back to Harstad's house. She told Christina that Harstad was "`an old perverted man'" and that "`he always touches me right here,'" placing her hand on her inner thigh "really close to her vagina" to demonstrate what Harstad had done. Johnson and Sh were in the car during this revelation. After B's disclosure, Christina dropped the girls off at Harstad's brother David's house to meet Kuether for the one-block walk back to where they lived with Harstad.
¶ 4 The next day, B told Christina that Harstad walked around in his underwear at night, "plays with his peepee, wiggles it around in front of her, and always wants ... her to touch his peepee." B was crying and asked her not to tell anyone because she was afraid that Child Protective Services would take them away. Christina did not contact the police.
¶ 5 Johnson, Kuether, and the girls moved into a house together in Lake Stevens in February 2007 after Johnson had completed work release. Kuether still intermittently stayed with Todd at Harstad's house. On one occasion in May 2007, as Johnson was dropping the girls off with Kuether, who was at Harstad's house, the girls cried and said they did not want to be there. Johnson later sat the girls down and asked why. B said she had seen Harstad "playing with his thing." Su said Harstad told them, "`let me see your pussy.'" Johnson told Kuether and Todd what he had learned but did not call the police.
¶ 6 Christina did not see the girls as often after they moved to Lake Stevens, although *627 she started getting frequent phone calls from Sh saying they were home alone, scared, and had not eaten. In response to some of these calls, she would go pick them up, finding their house dirty and foodless and the girls begging for leftovers from a market across the street. Johnson went back to jail twice in June 2007. On July 17, 2007, Christina called the police after receiving another call from Sh that she and her sisters were alone, afraid, and had no food. Christina was tired of the girls being left alone and was concerned that Sh was not getting the heart medication she needed during Kuether's absences. Christina's parent's, Sherry and Timothy Dick, took the girls into their house.
¶ 7 Steven Serabells, a CPS investigator, went to Sherry's house the next day after having received a neglect referral. Sherry and Christina were present during Serabells' conversation with the girls. Towards the end of the hour long conversation, Serabells asked if there was anything else they wanted to tell him. B became upset and started crying. Christina told the girls it was time to tell their secret, gave them a piece of jewelry to assure them they would not be taken away, and stepped outside the room with Sherry. At her sisters' urging, B mentioned that Harstad had touched her on her "pussy." Su also reported inappropriate behavior.
¶ 8 Serabells reported their disclosures to the Seattle Police Department, and Detective Donna Stangeland was assigned to the case. Carolyn Webster, a child interview specialist with the prosecutor's office, interviewed B, Su, and Sh separately. During B's interview, a recording of which was admitted at trial, she explained how Ron "used to put his hand like right by my private place." B said this would happen when she was sleeping on the couch wearing only underwear and a T-shirt. B said that Harstad would put his hand over her underwear, near her "private spot," and that his hand would "always be like rubbing it." This happened more than five times. B marked on a body drawing where Harstad touched her. B also demonstrated that Harstad would make a come here gesture by bending his index finger while whispering "let me[] see your pussy" to B. This happened "a lot of times," which B defined as more than five. B saw Harstad walk out of the bathroom naked more than ten times and saw the "front part" of his private place. During the interview, B asked to take a break to ask her sister if "it really happened or it was a dream." B wrote a note to her sisters to read before their interviews, telling them "I ♥ you [Su], plez tell the truth Sh to[o] ♥ xoxoxoxo."
¶ 9 The police arrested Harstad on July 25, 2007. Stangeland interviewed Harstad, who conceded only that he might have touched the girls in a nonsexual manner, that he put a blanket over Sh, and that he might have been visible to them on occasion walking naked at night from the bathroom to the bedroom. Harstad denied any improper touching, statements, or exhibition. A DVD of the interview was admitted at trial. The State charged Harstad with three counts of first degree child molestation against B, one count of first degree child molestation against Sh, misdemeanor indecent exposure to Su (count 5) and B (count 6), and felony communication with a minor (B and Su, respectively) for immoral purposes (counts 7 and 8).[3] The State alleged as aggravating factors that all the felonies had been committed shortly after Harstad was released from incarceration and that he had committed multiple current offenses that might otherwise go unpunished because of Harstad's high offender score. And for the communication with a minor for immoral purposes counts, the State alleged in aggravation that Harstad committed multiple offenses against each victim.
¶ 10 All three girls testified at trial. B told the jury that Harstad "touched [her] private place" and "[l]ike right by her private place." She drew a hand on the upper inner thigh of a body sketch to demonstrate where Harstad touched her. She said it happened at night and about six times. B said Harstad whispered, "[l]et me see" your "pussy," which made her "[m]ad and angry." B also told the jury that Harstad would stand next to the bathroom naked, standing still while *628 moving his "dick" with his hand, which made her feel "[n]asty."
¶ 11 Su described sleeping in the living room and waking up to see Harstad in the kitchen "[s]haking his private area," which was sticking out "[t]hrough the hole thing" in his underwear. Su thought Harstad was doing the dishes at first because he turned on the kitchen faucet, but then she could see what he was doing when he stepped to the side. What he was doing made her uncomfortable, and she closed her eyes. Su also saw Harstad in the hallway, naked, and making "psst" noises to catch her attention. Su told the jury that Harstad said, "`I want to see your "P" word,'" explaining that the word is spelled "P-u-s-s-y." Harstad made this request at the house and at the trailer.
¶ 12 Sh described a night when she was 11 and had fallen asleep fully dressed on a couch in Harstad's living room while watching TV. Sh became aware of Harstad putting an "itchy" blanket on her and putting his hands under the blanket and moving it around by her "private area," "probably about three [times]" "[a]cross [her] legs from side to side." Sh drew on the upper inner thighs of a body sketch to demonstrate where he had touched her. Harstad was "breathing hard," "[l]ike a whole bunch," when he was touching her. It made her scared, so she was quiet until she pushed the blanket off and ran into the room where Kuether and Todd were sleeping and told them.
¶ 13 The jury found Harstad guilty as charged. After a bifurcated proceeding, the jury also found that all of the aggravating factors had been committed. The trial court imposed a minimum term on counts 1-4 at the high end of standard range (198 months to life) and standard range sentence on counts 7-8 (60 months), all to run concurrently. The trial court acknowledged that the jury found aggravating factors but did not impose an exceptional sentence. For the misdemeanor indecent exposure convictions (counts 5 and 6), the court imposed 12 month sentences to be served concurrent with one another but consecutively to the felonies. Harstad appeals.

DISCUSSION
¶ 14 Evidence is sufficient to support a conviction if, after viewing all of the evidence in the light most favorable to the State, any rational juror could have found the elements of the crime proved beyond a reasonable doubt.[4] "A person commits the crime of Child Molestation in the First Degree when the person has sexual contact with a child who is less than twelve years old, who is not married to the person, and who is at least thirty-six months younger than the person."[5] "`Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party."[6] In determining whether the sexual contact element has been satisfied, we must look to the totality of the facts and circumstances presented.[7]

I. Sufficiency of the Evidence
¶ 15 Harstad argues that the State did not prove that B's and Sh's upper inner thighs were intimate parts and that the State did not prove his touching was done for the purposes of sexual gratification. "Contact is `intimate' within the meaning of the statute if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper."[8] A jury may determine that "parts of the body in close proximity to the primary erogenous areas" are intimate parts.[9] "Proof that an *629 unrelated adult with no caretaking function has touched the intimate parts of a child supports the inference the touch was for the purpose of sexual gratification," although we require additional proof of sexual purpose when clothes cover the intimate part touched.[10]
¶ 16 Here, B testified that Harstad touched her at night when everyone else was asleep, that she slept wearing only a "T-shirt and underwear, because [she] used to be hot a lot," that Harstad touched her "private place," which she defined as the part that is covered by her underpants, and "[l]ike right by [her] private place," that it happened "[a]bout six times or something," and that Harstad's hand would "always be like rubbing it" when he touched her. She also drew a hand on body sketch's upper inner thigh to demonstrate where she had been touched. In In re Welfare of Adams, this court held that "[a]s with the buttocks, we believe that the hips are a sufficiently intimate part of the anatomy that a person of common intelligence has fair notice that the nonconsensual touching of them is prohibited, particularly if that touching is incidental to other activities which are intended to promote sexual gratification of the actor."[11] Here, we conclude that a person of common intelligence could be expected to know that B's upper inner thigh, which puts the defendant's hand in closer proximity to a primary erogenous zone than touching the hip does, was an intimate part. Additionally, from the evidence that Harstad was always "rubbing" when he touched B's upper inner thigh, a reasonable jury could infer that Harstad's touching was incidental to another activity intended to promote sexual gratification.
¶ 17 Testimony that B slept in her underwear supports a finding that Harstad did not touch her upper inner thigh over her clothing, which in turn supports an inference of sexual purpose.[12] Testimony that he touched the part of B that her underwear covers is also evidence that he touched an intimate part over her clothing. And the evidence that Harstad's hand was "always [] like rubbing it" is sufficient additional proof to establish a sexual purpose, as is the evidence that Harstad whispered, "let me see your pussy" to B on other occasions.
¶ 18 Substantial evidence also supports the jury's conclusion that Harstad touched Sh's intimate parts when he put his hand under the blanket and moved it from side to side "[b]y [her] private area." Sh marked the upper inner thigh of the body sketch to show where Harstad touched her.[13] While the evidence does not show that Harstad touched Sh under her clothing, Harstad's moving his hand back and forth and his heavy breathing, "[l]ike a whole bunch," support an inference of sexual purpose sufficient to satisfy the sexual contact element of first degree child molestation.[14]
¶ 19 Harstad's suggestion he performed the sort of de facto caretaking role that would explain his touching of B and Sh is not supported by the evidence. Covering a child with a blanket could be seen as caretaking, but it is not the kind of caretaking that requires close contact with an unrelated child's intimate parts. Covering a child with a blanket in order to hide inappropriate touching is, put simply, not caretaking.

II. Vagueness
¶ 20 Penal statutes must provide fair notice of the conduct they proscribe and provide adequate standards against arbitrary, erratic, and discriminatory enforcement.[15] "A statute fails to provide the required notice if it `either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily *630 guess at its meaning and differ as to its application.'"[16] Harstad does not claim that people of common intelligence would differ about whether the part "right by [B's] private place" or the area in which he moved his hand from side to side "[b]y [Sh's] private place" were intimate parts. Harstad instead appears to argue that the statute is unconstitutionally vague on its face because it leaves the question of what an intimate part is to the fact-finder's discretion. "Vagueness challenges to enactments which do not involve First Amendment rights are to be evaluated in light of the particular facts of each case."[17] There is no basis under the facts of this case to hold that the statute is vague. Washington's sexual contact statute provides fair notice to any reasonable person of common intelligence that rubbing and touching a child's upper inner thighs, adjacent to her genitals, in a sexual manner is prohibited sexual contact. Accordingly, there is no basis on which to rule that the jury should have analyzed these facts under the rule in State v. Woodley.[18]

III. Vouching for B's Credibility
¶ 21 Because Harstad did not object to Webster's testimony at trial, he must show both an error of constitutional magnitude and material prejudice.[19] Generally, an expert may not "base an opinion about an ultimate issue of fact solely on the expert's determination of a witness's veracity."[20] But "[a]dmission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a `manifest' constitutional error. `Manifest error' [in this context] requires a nearly explicit statement by the witness that the witness believed the accusing victim."[21]
¶ 22 Harstad contends that the prosecutor asked Webster whether B had been telling the truth and that Webster responded yes. But a complete review of Webster's testimony does not support Harstad's claim. Webster testified about her forensic interview with B. As part of Webster's interview protocol, she obtained a promise from B to tell the truth. And she instructed B to correct her if she made a mistake. She explains that rule to children because she is "trying to get as much accurate information from the child as possible. So if we get something wrong, we want them to correct us." Harstad's counsel cross-examined Webster, and at the end of re-direct, the following exchange occurred:
[Prosecutor:] So turning your attention to page eight [of Ex. 23], following your rules, you move on to the truth and a lie, and you ask the question at line 15?
[Webster:] "Is it better to tell the truth or to tell a lie?"
Q: And [B] tells you?
A: "Tell the truth."
Q: And you say?
A: "How come the truth is better?"
Q: And [B] says?
A: "Uh, so you guys can do stuff right."

*631 A: And then you go on to say at line 19?
Q: "Yeah, okay. And when we talk in here today, it's important that we only talk about the truth. Promise we'll only talk about the truth today?"
Q: And what does [B] do?
A: She nods her head "yes."
Q: You also talked aboutwhen asked about the difference between open-ended questions and directed questions, you said something in response to counsel about that older kids will also correct you when you say something that maybe you got wrong. Did [B] correct you at all during this interview?
A: Yes, she did.
Q: And as a child interview specialist with your training and your experience, did that indicate to you that she was following your instructions?
A: To the best that I could see, yes.
¶ 23 Harstad urges us to adopt an implausible reading of this testimony. The more natural reading of the prosecutor's questioning shows that she was following up on Webster's answer to her previous question by asking whether, when B corrected Webster, she was following Webster's instructions to correct her during the interview. Accordingly, we hold that Harstad did not establish manifest constitutional error because the record does not even support his claim that the prosecutor asked Webster if she believed B.

IV. Sentencing
¶ 24 The sentencing court did not impose an exceptional sentence. For first degree child molestation (counts 1-4), which has a seriousness level of 10, 149 to 198 months is the standard range for an offender with a score of 15.[22] Because Harstad committed first degree child molestation, he was subject to sentencing under RCW 9.94A.712(3)(a), which requires the court to "impose a sentence to a maximum term and a minimum term," under which "[t]he maximum term shall consist of the statutory maximum sentence for the offense."[23] "[T]he minimum term shall be either within the standard sentence range for the offense, or outside the standard sentence range ... if the offender is otherwise eligible."[24] Whether or not Harstad was eligible for sentencing outside of the standard range, the trial court imposed a minimum term of 198 months, which is within the standard range, on counts 1-4 and ran those sentences concurrently.
¶ 25 Felony communication with a minor for immoral purposes (counts 7-8) has a seriousness level of 3,[25] making the standard range 51-68 months for an offender with a score over 9.[26] On those counts, the trial court imposed 60 month sentences concurrent to each other and to the sentence on counts 1-4. Thus, all the felony sentences were within standard range. Harstad did not receive an exceptional sentence based on the aggravated factor finding that he communicated with a minor for immoral purposes on multiple occasions. Accordingly, he has no basis on which to appeal from the allegedly erroneous instructions.
¶ 26 Harstad also argues that the trial court relied on the allegedly erroneous findings in running Harstad's sentence for his two indecent exposure misdemeanor convictions consecutively to his sentence for the felony counts. But the trial court has discretion to run misdemeanor sentences consecutively even though there are no aggravating factors.[27] And the record shows that the trial court elected to run the misdemeanor sentences consecutively in order to adequately punish Harstad for "free crimes." This *632 decision is within its discretion. The court did not rely on the jury's finding that he repeatedly communicated with the girls for immoral purposes.[28]

V. Ineffective Assistance
¶ 27 To demonstrate ineffective assistance, Harstad must show that defense counsel's representation fell below an objective standard of reasonableness and that the deficient representation prejudiced him.[29] To show prejudice, Harstad must establish that there is a reasonable probability the result would have been different but for the deficient performance.[30]

A. Not Objecting to B's Competency
¶ 28 A child is competent to testify if, among other factors, she understands the obligation to testify truthfully.[31] Here, B oddly but accurately explained that telling the truth was better than lying "[b]ecause you would get it over with" and that lying is bad because "[y]ou would just have to keep on going" and that the punishment for lying is that "you will have to do it over and over until you tell the truth." As the trial court explained, other possible answers could have more clearly demonstrated that B understood her obligation to tell the truth, but her answer shows that she thinks good things would happen to her if she told the truth and that bad things would happen if she lied. Her statement that she would have to keep going if she lied also supports an inference that she thought a lie would be detected and would not satisfy the questioner. Because nothing else in the record casts doubt on B's competency,[32] reasonable counsel would not have objected to one curious but satisfactory explanation of why telling the truth is better than lying.

B. Not Offering Evidence That Sh Had Been Abused by One of Kuether's Previous Boyfriends After the Prosecutor Allegedly Opened the Door to That Evidence
¶ 29 The record shows that the prosecutor did not do anything to make evidence of prior abuse relevant. Instead, Su merely made a passing reference that "[Sh] told him [presumably Serabells] about him [presumably Harstad] and some other time, about a different person." Because the prosecutor did not elicit this vague reference to "some other time," he did not open the door for defense counsel to explore Su's passing reference on cross-examination.[33] Thus, objectively reasonable counsel would not have sought to introduce evidence of past abuse. Nor is there a reasonable probability that the trial court would have admitted evidence of the past abuse based on this passing reference.[34] Even if it had admitted the evidence, it is highly unlikely that the evidence would have convinced the jury that Harstad was not responsible for touching these girls.

C. Not Objecting to the Note B Wrote to Her Sisters During Her Forensic Interview Urging Them To Tell the Truth
¶ 30 The record shows that Harstad's counsel effectively used this evidence to build on one of the defense themes, which was that the girls were influenced by one another in a manner that tainted the reliability of their statements. "[T]his court will not find ineffective assistance of counsel if `the actions of counsel complained of go to the theory of the case or to trial tactics.'"[35]

*633 D. Not Objecting to the Trial Court's Ruling in Response to David Harstad's Testimony

¶ 31 The girls were frequently at Harstad's brother's house, and the defense sought to establish that the girls never said anything to him about the abuse. The trial court struck David's testimony that the girls never told him that Harstad had done anything to them as hearsay. Defense counsel did not object. Even if the statement is not hearsay, the trial court would have been within its discretion to strike the testimony as irrelevant under ER 401. The fact that the girls did not reveal to their mom's boyfriend's dad's brother, who was also their molester's brother, that his brother was touching them inappropriately does not make it any more or less likely that the molestation actually occurred.[36] Accordingly, the evidence would not have come in even if defense counsel had objected to its exclusion on hearsay grounds.[37]

E. Defense Counsel Did Not Propose Instructions Clarifying the Aggravating Factor Findings
¶ 32 The State correctly argues that even if not proposing clarifying instructions had been deficient, Harstad did not receive an exceptional sentence and thus was not prejudiced by any alleged deficiency.[38]

F. Cumulative Error
¶ 33 Harstad's argument that defense counsel's allegedly numerous trial strategy deficiencies constitute cumulative error is not persuasive. It is not supported by case law establishing how defense counsel's being "relatively mute" was actually deficient or prejudicial.

G. Statement of Additional Grounds
¶ 34 In his statement of additional grounds for review, Harstad argues that his lawyer was deficient in excusing one crucial witness. Harstad is apparently referring to counsel's decision not to call his son, Todd, as a witness. The record does not show what exculpatory testimony, if any, Todd would have provided if called as a witness. Thus, we cannot determine from the record provided if defense counsel's decision not to call Todd was deficient.[39]
¶ 35 Affirmed.
WE CONCUR: GROSSE and APPELWICK, JJ.
NOTES
[1] B was 9 years old at trial, Su was 11, and Sh was 12.
[2] Toby is not Su's biological father, but he considers himself the father of all three girls.
[3] Harstad had prior communication with a minor for immoral purposes convictions.
[4] State v. Joy, 121 Wash.2d 333, 338, 851 P.2d 654 (1993).
[5] See RCW 9A.44.083.
[6] See RCW 9A.44.010(2).
[7] See State v. Brooks, 45 Wash.App. 824, 826, 727 P.2d 988 (1986).
[8] State v. Jackson, 145 Wash.App. 814, 819, 187 P.3d 321 (2008).
[9] In re Welfare of Adams, 24 Wash.App. 517, 521, 601 P.2d 995 (1979).
[10] State v. Powell, 62 Wash.App. 914, 917, 816 P.2d 86 (1991), review denied, 118 Wash.2d 1013, 824 P.2d 491 (1992).
[11] 24 Wash.App. at 517, 520, 601 P.2d 995 (1979).
[12] See Powell, 62 Wash.App. at 917, 816 P.2d 86.
[13] Harstad argues that exhibit 21 does not support the State's claim that Sh demonstrated that Harstad touched her upper inner thighs. But our review of the exhibit shows that the State properly described the evidence.
[14] See id.
[15] City of Spokane v. Douglass, 115 Wash.2d 171, 180, 795 P.2d 693 (1990).
[16] State v. Watson, 160 Wash.2d 1, 7, 154 P.3d 909 (2007) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).
[17] Douglass, 115 Wash.2d at 182, 795 P.2d 693.
[18] 306 Or. 458, 760 P.2d 884 (1988). Nor is it not clear how applying State v. Woodley's test would lead to a different analysis or conclusion here, or how using that test would cure any alleged vagueness infirmities. Under Woodley, the person touched must regard the part as intimate. Id. at 463, 760 P.2d 884. Evidence that both girls testified that Harstad touched them in their "private places" satisfies that threshold. Next, if the accused did not know the part was intimate to the person, the State must prove beyond a reasonable doubt that the accused should have recognized it to be an intimate part, which is what the State established here. See id. And our review of the evidence shows that the State presented sufficient evidence to support the jury's determination that the girls' upper inner thighs were intimate parts.
[19] See RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed error[] for the first time in the appellate court: ... (3) manifest error affecting a constitutional right."); State v. McFarland, 127 Wash.2d 322, 333, 899 P.2d 1251 (1995).
[20] State v. Fitzgerald, 39 Wash.App. 652, 657, 694 P.2d 1117 (1985).
[21] State v. Kirkman, 159 Wash.2d 918, 936, 155 P.3d 125 (2007).
[22] See RCW 9.94A.515.
[23] RCW 9.94A.712(3)(b).
[24] RCW 9.94A.712(3)(c)(ii).
[25] RCW 9.94A.515, Table 2.
[26] RCW 9.94A.515, Table 1.
[27] State v. Besio, 80 Wash.App. 426, 431, 907 P.2d 1220 (1995) (holding that the Sentencing Reform Act applies only to felonies); State v. Langford, 67 Wash.App. 572, 587-88, 837 P.2d 1037 (1992) ("Thus, the court did not need to find reasons justifying an exceptional sentence to impose the consecutive sentences" for the misdemeanor convictions on top of the sentences for the felony convictions.), cert. denied, 510 U.S. 838, 114 S.Ct. 118, 126 L.Ed.2d 83 (1993).
[28] By "free crimes" the trial court is referring to crimes that go unpunished because Harstad has an offender score of 15 and the standard range does not change for offender scores of 9 and above.
[29] See McFarland, 127 Wash.2d at 334-35, 899 P.2d 1251.
[30] See State v. Townsend, 142 Wash.2d 838, 843-44, 15 P.3d 145 (2001).
[31] State v. Allen, 70 Wash.2d 690, 692, 424 P.2d 1021 (1967).
[32] The trial court found that the "evidence amply supports a finding that B is a competent witness."
[33] See State v. Stockton, 91 Wash.App. 35, 40, 955 P.2d 805 (1998) (passing reference to a prohibited topic does not open door for cross-examination about that topic).
[34] Defense counsel did seek to introduce evidence of past abuse earlier in the trial, but the trial court ruled against him.
[35] State v. Garrett, 124 Wash.2d 504, 520, 881 P.2d 185 (1994) (quoting State v. Renfro, 96 Wash.2d 902, 909, 639 P.2d 737, cert. denied, 459 U.S. 842, 103 S.Ct. 94, 74 L.Ed.2d 86 (1982)).
[36] The trial court ruled that defense counsel's rephrased question on the same subject would not be allowed because it was irrelevant. Evidentiary rulings are within the sound discretion of the trial court, and we find abuse of discretion only where no reasonable person would have ruled as the trial court did. State v. Atsbeha, 142 Wash.2d 904, 913-14, 16 P.3d 626 (2001). Here, the trial court did not abuse its discretion by ruling that the evidence was irrelevant. And because the evidence is not relevant, Harstad cannot establish how he was prejudiced by the court's refusing to admit it.
[37] See State v. Kelley, 64 Wash.App. 755, 764, 828 P.2d 1106 (1992) ("A trial court may be affirmed on any basis supported by the record and the law.").
[38] See State v. Garcia, 57 Wash.App. 927, 932, 791 P.2d 244, review denied, 115 Wash.2d 1010, 797 P.2d 511 (1990) (holding that this court need not address deficiency prong where no prejudice shown).
[39] Matters outside the record cannot be considered on appeal. State v. Crane, 116 Wash.2d 315, 335, 804 P.2d 10, cert. denied, 501 U.S. 1237, 111 S.Ct. 2867, 115 L.Ed.2d 1033 (1991). If Harstad wishes to challenge his lawyer's decision not to call a witness, then he must raise his claim in a properly supported personal restraint petition. McFarland, 127 Wash.2d at 335, 899 P.2d 1251. See In re Personal Restraint of Rice, 118 Wash.2d 876, 885-86, 828 P.2d 1086, cert. denied, 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992); RAP 16.4, 16.7.