IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　v.<br><br>BRANDON ODAH OSBORN,<br><br>　　　　　　Appellant. | No. 87214-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Brandon Osborn appeals his conviction of child molestation in the second degree, claiming that insufficient evidence supports his conviction. We disagree and affirm.

FACTS

Osborn's son and S.N.B. were friends. S.N.B. would often stay overnight at the Osborn's house. Such was the case Memorial Day weekend in May 2021 after the three attended a barbeque. On Saturday night Osborn, then 50 years old, his son, then 12 years old, and S.N.B., then 12 years old, were the only ones in Osborn's house. Osborn, who had been drinking, poured vodka into a shot glass and wanted S.N.B. to drink it. Osborn's son drank it instead because otherwise Osborn would have yelled at them.

That night S.N.B. fell asleep on the living room couch before midnight. Around 2:00 a.m. or 3:00 a.m., S.N.B. woke up to find her pants and underwear around her knees and Osborn, naked and "hovering" or "kneeling" over her. S.N.B. was on her back

and Osborn was "on top" of her with S.N.B.'s legs between his legs, which were both on the couch. When asked to describe their body positions, S.N.B. testified:

A.   I was laying down on the couch and –
Q.   Were you on your belly or your back or your side?
A.   On my – on my back, and he was – he had one arm on the back of the couch and I – I think one arm on the side of the couch. I don't know where the other arm was. He was just hovering over me.
Q.   Was he on the bed or standing there or what?
A.   He was on the couch. He was – he – I know that he didn't have any legs on the floor because I heard his feet hit the floor when I sat up.
Q.   Do you know where his knees were?
A.   They were, like – my legs were in between his legs.

S.N.B. testified she had not felt her pants and underwear being taken down and did not pull them down herself. When asked if Osborn had touched her "anywhere else besides taking … your pants down," S.N.B. answered, "I don't know." When asked if she touched Osborn with any parts of her body, S.N.B. answered, "Maybe my legs when I went to go get up."

S.N.B. testified she got Osborn off of her after she woke up. Osborn then jumped over the back of the couch, ran down the hallway into his son's bedroom, and hid under his son's bed. S.N.B. immediately ran down the hallway after him and turned on the light and that is when she saw that he was naked. S.N.B. then grabbed her phone and went into the bathroom. During that time, Osborn went into his room and got dressed. S.N.B. acted like someone was calling her and that it was an emergency and that she needed to get home right away. S.N.B. wanted to walk but Osborn insisted that his son drive her home. Though the son was only 12 years old, it was not the first time he had driven S.N.B. home.

According to the son, he had gone to bed around 10:00 p.m. and was asleep until his father woke him up and asked him to drive S.N.B. home around 4:00 a.m. When the son returned home, Osborn had the truck packed and they immediately left

2

for the Tri-Cities.

S.N.B. shared what had happened with a classmate the first day of school following the holiday weekend. The classmate gave S.N.B. advice and S.N.B. then told her teacher, who alerted the school principal. The principal reported it to police. S.N.B.'s teacher, principal, and a forensic interviewer testified that at the time of their conversations with S.N.B. she cried and was "very upset," "fragile," and "pretty stressed."

Police obtained an arrest warrant but could not track Osborn down until May 2022. When they realized Osborn's son had returned to the area, they believed Osborn would have as well. Police arrested Osborn at his home. After his arrest, police discovered a hole had been cut in the floor of the master bedroom to provide access to the crawl space underneath the house.

Osborn was charged in July 2021 with one count of child molestation in the second degree and one count of intimidating a witness. Osborn did not testify at trial and defense did not call any witnesses. At trial both Osborn's son and adult daughter said the cut out in the floor of the master bedroom was made after Memorial Day weekend when Osborn was hiding from sheriff's deputies. Osborn's son also testified at trial that his father had him rehearse a good 300 times a "story" that S.N.B. fell in the toilet where chew that Osborn had spat out was floating around, and that was how Osborn's "DNA got on to her."

The jury found Osborn guilty of child molestation in the second degree and not guilty of intimidating a witness. He was sentenced to 41 months of confinement.

Osborn appeals.

## DISCUSSION

Osborn contends that the State presented insufficient evidence to prove he had sexual contact with S.N.B. as necessary to support his conviction under RCW 9A.44.086. Osborn argues the jury's finding of sexual contact was instead impermissibly based on speculation or conjecture. We disagree.

We review a sufficiency of the evidence challenge de novo. State v. Harris, 199 Wn. App. 137, 146, 398 P.3d 1229 (2017). Evidence is sufficient to support a conviction if, after viewing all of the evidence in the light most favorable to the State, any rational juror could have found the elements of the crime proved beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Our review is "highly deferential to the jury's decision." State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the jury on issues of conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

Circumstantial and direct evidence carry equal weight. State v. Scanlan, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). As such, circumstantial evidence may be used to establish any element of a crime. State v. Garcia, 20 Wn. App. 401, 405, 579 P.2d 1034 (1978). "The jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference." State v. Jackson, 112 Wn.2d 867,

4

875, 774 P.2d 1211 (1989). For a trier of fact to draw inferences from proven circumstances, the inferences must be "rationally related" to the proven facts. Id. An unreasonable inference is one that is based on speculation or conjecture. State v. Jameison, 4 Wn. App. 2d 184, 197-98, 421 P.3d 463 (2018); see also Helman v. Sacred Heart Hosp., 62 Wn.2d 136, 148, 381 P.2d 605 (1963) ("[W]hile facts may be proved by circumstantial evidence, a verdict may not be founded on mere theory or speculation.").

To convict Osborn, the State was required to prove he violated RCW 9A.44.086, which provides:

> (1) A person is guilty of child molestation in the second degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is at least twelve years old but less than fourteen years old and the perpetrator is at least thirty-six months older than the victim.

Sexual contact is defined as:

> any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party.

RCW 9A.44.010(13).

In determining whether the sexual contact element has been satisfied, we look to the totality of the facts and circumstances presented. State v. Harstad, 153 Wn. App. 10, 21, 218 P.3d 624 (2009); see State v. Brooks, 45 Wn. App. 824, 826, 727 P.2d 988 (1986) (stating that circumstantial evidence may be sufficient to satisfy the element of sexual contact).

Finding sexual contact does not require direct proof of direct contact between the defendant's sexual organs with the victim's intimate parts. Brooks, 45 Wn. App. at 827; see Harstad, 153 Wn. App. at 22-23 (holding that defendant's touching and rubbing of minor girls' upper inner thighs constituted sexual contact). Contact is intimate "if the

conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper." Harstad, 153 Wn. App. at 21. The term "intimate" has a broader meaning than "sexual" and includes "parts of the body in close proximity to the primary erogenous areas," such as the hips, buttocks, and lower abdomen. Id. at 21; In re Welfare of Adams, 24 Wn. App. 517, 519-21, 601 P.2d 995 (1979). Generally, the determination of which bodily areas are intimate is a question of fact that should be left to the jury. See Adams, 24 Wn. App. at 520.

In addition to establishing an intimate touch, the State must prove the defendant acted with a purpose of sexual gratification. State v. Stevens, 158 Wn.2d 304, 309-10, 143 P.3d 817 (2006). Sexual gratification is not an explicit element of child molestation in the second degree. Id. at 309. Rather, the requirement that the State establish the defendant acted for the purpose of sexual gratification "operate[s] to exclude inadvertent touching or contact from being a chargeable offense." Id.

Here, circumstantial evidence supports a reasonable inference that Osborn had intimate contact with S.N.B. S.N.B. went to sleep with her pants and underwear on. She did not pull them down, but woke up with them pulled down to her knees and Osborn physically straddled over her on the couch while naked. Osborn's son was sleeping the entire time until his father woke him up to drive S.N.B. home. A reasonable inference is that Osborn pulled down S.N.B.'s underwear, which meant contacting her hip area. See Harstad, 153 Wn. App. at 21.

In Adams, 24 Wn. App. at 518, the evidence established that Adams was positioned on top of the victim after undoing and removing her pants down to her

6

midthigh. This court held,

> As with the buttocks, we believe that the hips are a sufficiently intimate part of the anatomy … particularly if that touching is incidental to other activities which are intended to promote sexual gratification of the actor. In other words, the hips need not be the primary objective, nor were they in this case. The necessary result of the removal of the [victim's] slacks was to render more accessible [her] lower abdomen …. A person of common understanding should have no trouble in recognizing that the hips and lower abdomen are [intimate] parts.

Id. at 520-21. Akin to Adams, the jury in the instant case could reasonably infer that Osborn's contact with S.N.B.'s hips area in the process of pulling down her pants and underwear was intimate. See Harstad, 153 Wn. App. at 22 (discussing Adams). Because it is within the jury's purview to determine intimate parts based on their common knowledge and experience, substantial evidence supports a reasonable inference that Osborn's removal of S.N.B.'s clothing from her hip area constituted an "intimate" touching. See id. at 21.

"Proof that an unrelated adult with no caretaking function has touched the intimate parts of a child supports the inference the touching was for the purpose of sexual gratification," although we require additional proof of sexual purpose when clothing covers the intimate part touched. Id.; see, e.g., State v. Powell, 62 Wn. App. 914, 917, 816 P.2d 86 (1991) (citing multiple decisions wherein courts have held that evidence provided additional proof of sexual gratification). Sexual gratification can be inferred from the nature and circumstances of the act itself. State v. Tilton, 111 Wn. App. 423, 430, 45 P.3d 200 (2002); vacated on other grounds by 149 Wn.2d 775, 72 P.3d 735 (2003).

Here, viewed in totality the record provides ample basis for the jury's conclusion that Osborn's conduct was sexually motivated. There is neither evidence of Osborn acting as S.N.B.'s caretaker or any reasonable caretaking explanation as to why a

7

naked Osborn would be straddled over S.N.B. while her pants and underwear are pulled down to her knees. Such conduct cannot be claimed to be inadvertent. See State v. T.E.H., 91 Wn. App. 908, 916, 960 P.2d 441 (1998) (ruling that "[t]he nature of the act itself shows sexual gratification"). The evidence that Osborn ran and hid under a bed after S.N.B. woke up supports an inference of regret and concealment that suggests that Osborn understood the nature of the act and intended to keep it private and unknown from S.N.B. The conduct occurred in a house where the only other person in the house was sleeping. Osborn went to great lengths to hide from police. He also asked his son to rehearse an elaborate story to explain how his DNA might be found on S.N.B., which involved her falling in a toilet to apparently cause, as is reasonably inferable, her private area to come into contact with Osborn's expectorated chew. We conclude the State presented sufficient evidence to support an inference that Osborn intended to derive sexual gratification from the sexual contact.

Lastly, Osborn argues the jury found sexual contact based on an impermissible "stacking" of two inferences. Osborn specifically asserts that the finding of sexual contact required the jury to pair the inference that Osborn intimately touched S.N.B. with the second inference that Osborn did so for sexual gratification. However, Osborn does not explain how authority supports this purported anti-stacking rule, see RAP 10.3(a)(6), and his cited authority does not stand for such a proposition. Osborn cites to State v. Hundley, 126 Wn.2d 418, 421, 895 P.2d 403 (1995) (holding that conflicting lab test results do not amount to proof beyond a reasonable doubt of the presence of drugs), State v. Hutton, 7 Wn. App. 726, 731-32, 502 P.2d 1037 (1972) (holding that without some opinion evidence, identifying a substance requires an adequate chain of

8

circumstantial evidence), and State v. Jones, 140 Wn. App. 431, 437-38, 166 P.3d 782 (2007) (holding there was no reasonable inference of a specific distance without evidence of accurate calculations). In a determination of whether the sexual contact element has been satisfied, we must look to the totality and circumstances presented. Harstad, 153 Wn. App. at 21. This includes the possible reasonable inference of sexual gratification so as to determine that a touch is not inadvertent or consequential of caretaking. Tilton, 111 Wn. App. at 430. A jury may rely exclusively upon circumstantial evidence to support its decision, and in a sufficiency of evidence review we are required to draw all reasonable inferences in favor the State. State v. Jackson, 145 Wn. App. 814, 818, 187 P.3d 321 (2008); In re Pers. Restraint of Arntsen, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). Osborn provides no authority to stray from this well-established precedent. See State v. Stalker, 152 Wn. App. 805, 810-11, 219 P.3d 722 (2009) (discussing the reasons why "[c]ourts do not 'lightly set aside precedent'") (quoting State v. Kier, 164 Wn.2d 798, 804-05, 194 P.3d 212 (2008)).

Viewing the evidence in the light most favorable to the State, any rational juror could have found that Osborn touched S.N.B. in an intimate area for the purpose of sexual gratification.

Affirmed.

_Coburn, J._

WE CONCUR:

_Díaz, J._

_Smith, C.J._