# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59506-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RIGOBERTO GOMEZ, JR., | |
| Appellant. | |

PRICE, A.C.J. — In March 2024, Rigoberto Gomez, Jr. was found guilty of third degree child molestation after a bench trial.  Gomez appeals, arguing that (1) insufficient evidence supports his conviction because the State failed to prove "sexual contact," and (2) three of his community custody conditions imposed by the trial court were either outside its statutory authority or were unconstitutional.

We affirm Gomez's third degree child molestation conviction but remand the judgment and sentence to the trial court to modify each of the challenged community custody conditions.

FACTS

I. BACKGROUND

In the summer of 2023, Gomez and his children lived in a home owned by another couple, Justin and Michelle.  Also in the home were Justin and Michelle's two children—G.S. (17-year-old son) and A.S. (15-year-old daughter).  Gomez and A.S. worked together at a coffee shop owned by Michelle.  People observed that the two developed a close relationship.

On July 17, 2023, G.S. arrived home early from a camping trip to find Gomez, a 30-year-old man, lying in bed beside A.S.  Believing that something sexual was occurring, G.S. confronted the two.  A.S. was upset and begged G.S. not to tell their parents.  Gomez apologized and attempted to explain, in part, by blaming A.S.  Following the confrontation with G.S., A.S. left the home.

Law enforcement was called.  Gomez was arrested while A.S.'s family and friends searched for A.S.  Several hours later, A.S. was found; she had died from a self-inflicted gunshot wound.

The State charged Gomez with third degree child molestation.  Gomez waived his right to a jury, and the case proceeded to a bench trial.

## II. TRIAL TESTIMONY

At trial, the State primarily relied on testimony from G.S., Michelle, and law enforcement.

## A. G.S. TESTIMONY

G.S. testified that on July 17, 2023, he and his friend returned home from a camping trip early.  When they arrived and opened the front door, they found Gomez in bed with A.S.  G.S. testified that Gomez was completely nude and A.S. was nude from the waist down.  G.S. confirmed that he saw both A.S. and Gomez's genitalia.  The two were lying in the same direction with their heads together at the foot of the bed.  A.S. was on her back and, from what G.S. saw, Gomez was "on top of her or right next to her," facing down.  2 Verbatim Rep. of Proc. (VRP) at 542.  Both Gomez and A.S. immediately "jumped up" and covered their faces when they saw G.S. walk through the door.  2 VRP at 544, 578.  While A.S. went upstairs to change her clothes, Gomez covered his genitalia and put on shorts (then a tank top).  According to G.S., Gomez kept "giving

him excuses," repeatedly telling G.S. "that he had a weak moment," "that [A.S.] came onto him," "that it only happened once," and "that it was a mistake." 2 VRP at 550-52.

G.S. also testified that although A.S. initially cried, she eventually became angry and tried to lock G.S. in the bathroom. She begged him not to tell their parents. Soon, A.S. left, and G.S. did not know where she had gone. Gomez told G.S. that he thought she was going into the woods and that she had taken his gun and car keys. G.S. and Gomez began to look for her, but when they could not find her, G.S. called his parents. Later that evening, G.S. found his sister's body. She had died of an apparent suicide.

## B. A.S. PARENT TESTIMONY

Michelle testified that Gomez had lived with her family for nearly a year. On the day of the incident, Michelle testified that she received a text message from Gomez that said, "Michelle, please do not call the cops and let me explain, please. . . . I have no excuses. . . ." 1 VRP at 282. She then received a call from G.S. who told her what happened, which is when Michelle contacted law enforcement.

## C. LAW ENFORCEMENT TESTIMONY

Detective Lyle was the lead investigator. He testified about the investigation and statements Gomez made to law enforcement, including statements that Gomez made in a recorded interview.

In these statements, Gomez claimed that he did not actively participate in the contact with A.S. and that it was A.S. who was inappropriate. Gomez explained that when A.S. got into his bed he was "half-asleep" and unsure if anything A.S. did was intentional. Ex. 11 (Jul. 17, 2023, audio recording) at 6 min., 25 sec.; 25 min., 55 sec.; 1 hr., 13 min., 7 sec. The only thing he knew, and consistently asserted, was that "[he] wasn't doing anything."[1]

Gomez said that he did not want to get A.S. "in trouble," that "[A.S.] was young and dumb," and that she "made a dumb mistake."[2] He described how A.S. "was trying to bump up against [him]" and "push up against [him]" with her backside against his leg. Ex. 11 at 1 hr., 8 min., 33 sec. through 9 min., 21 sec. He said that "she was trying to take it further . . . to get something to happen . . . backing up against me," but he claimed that "it never got that far." Ex. 11 at 1 hr., 6 min., 44 sec. through 7 min., 45 sec.; 1 hr., 22 min., 36 sec. Gomez explained that whatever A.S. was doing, he "thought it was clear [to A.S.] already" that it was inappropriate because he and A.S. had previously discussed "how there's gotta be boundaries . . . there are certain things that are acceptable and things that are not." Ex. 11 at 1 hr., 24 min., 52 sec. through 25 min., 25 sec.

D. TESTIMONY REGARDING A.S. AND GOMEZ'S BEHAVIOR AND INTERACTIONS

Several other witnesses testified to their observations of A.S. and Gomez's interactions when they worked together at the coffee shop. These witnesses described how A.S. would refer

---

[1] Ex. 11 at 1 hr., 11 min., 24 sec.; 1 hr., 14 min., 11 sec.; 1 hr., 16 min., 9 sec.; 1 hr., 16 min., 42 sec.; 1 hr., 16 min., 56 sec.; 1 hr., 17 min., 25 sec.; 1 hr., 22 min., 12 sec.; 1 hr., 24 min., 19 sec.; 1 hr., 25 min., 32 sec.; 1 hr., 26 min., 25 sec.

[2] Ex. 11 at 20 min., 1 sec.; 30 min., 53 sec.; 37 min., 24 sec.; 1 hr., 3 min., 30 sec., 1 hr., 24 min., 33 sec.

to Gomez as "babe." 1 VRP at 330, 348. Gomez and A.S. would often hug and say that they loved each other. One coworker testified that Gomez and A.S. appeared "more than friendly" and that on occasion this coworker saw Gomez place his hands on the small of A.S.'s back while they hugged and place his hands on her hips to move her aside when the coffee shop got busy. 1 VRP at 341.

### III. VERDICT, SENTENCING, AND COMMUNITY CUSTODY CONDITIONS

Following the bench trial, the trial court found Gomez guilty of third degree child molestation.[3] The trial court sentenced Gomez to 20 month's confinement.[4]

The trial court also imposed community custody conditions. Relevant to this appeal, conditions 7, 8, and 10 required:

[Condition 7] Submit to urine and/or breath screening at the direction of the Community Corrections Officer [(CCO)]

[Condition 8] Submit to polygraph examinations at the direction of the [CCO]

. . . .

[Condition 10] Obtain assigned CCO and treatment provider permission prior to engaging in a romantic or sexual relationship and disclose their status as a sex offender and the nature of their offending, to include unadjudicated victims, to anyone with whom they intend to begin such a relationship

---

[3] Gomez was also charged with first degree unlawful possession of a firearm and first degree unsafe storage of a firearm. The trial court found Gomez guilty of unlawful possession of a firearm but acquitted him of unsafe storage of a firearm. Gomez does not appeal his conviction for first degree unlawful possession of a firearm.

[4] Gomez initially argued that the trial court failed to file written findings of fact and conclusions of law, pursuant to CrR 6.1(d). This claimed error is moot because the trial court filed the requisite findings and conclusions on September 12, 2025, and Gomez has alleged no prejudice from the late filing.

No. 59506-1-II

Clerk's Papers (CP) at 52 (Appendix F).

Gomez appeals.

ANALYSIS

Gomez makes two arguments: (1) that there is insufficient evidence to support his conviction, and (2) that three of his community custody conditions—conditions 7, 8, and 10—are unsupported by statute or are unconstitutional.

We affirm Gomez's conviction, but we remand to the trial court to modify each of the challenged community custody conditions.

I. SUFFICIENCY OF THE EVIDENCE

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). After properly construing the evidence, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *State v. Bergstrom*, 199 Wn.2d 23, 40-41, 502 P.3d 837 (2022).

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Our review for sufficiency of the evidence in a criminal case is

6

the same regardless of whether the finder of fact was a jury or the trial court. *Roberts*, 5 Wn.3d at 247.

To prove third degree child molestation, the State must show that the defendant had *sexual contact* with a child between the ages of 14 and 16 and that the defendant was at least 48 months older than the victim. *See* RCW 9A.44.089 (emphasis added). " 'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13); *State v. Stevens*, 158 Wn.2d 304, 307, 143 P.3d 817 (2006). Because unintended or accidental contact cannot be for the purpose of gratifying a person's sexual desires, sexual contact must be intentional. *See State v. Woolworth*, 30 Wn. App. 901, 905-06, 639 P.2d 216 (1981); *see also Stevens*, 148 Wn.2d at 309-310.

But sexual motivation or intent may be proven by circumstantial evidence. Intent can be inferred by a defendant's conduct when that conduct and the " 'surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.' " *State v. Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013) (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)); *see In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 726-31, 543 P.3d 821 (2024) (stating that specific intent may be inferred from conduct); *see also State v. Harstad*, 153 Wn. App. 10, 22-23, 218 P.3d 624 (2009) (a defendant's sexual purpose was inferred from contextual facts such as body positioning, state of undress, statements, and conduct). When an adult with no caretaking function touches the intimate parts of a child, an inference of sexual gratification is supported. *Harstad*, 153 Wn. App. at 21.

Here, Gomez argues that the State failed to prove intentional "sexual contact"—volitional touching for sexual gratification. Gomez contends that inferences from mere proximity cannot

substitute proof of intentional contact, particularly given the absence of eyewitness testimony to establish any actual touching and Gomez's own equivocal statement attributing any brief contact to accidental bumping.

We are not persuaded. G.S.'s testimony readily supports a reasonable inference that sexual contact occurred. G.S. saw Gomez completely nude, face down, on top of or immediately next to A.S. And A.S. was nude from the waist down. When G.S. unexpectedly entered the room, both quickly "jumped up" and covered themselves. Moreover, Gomez's statements to G.S. essentially constituted an admission of sorts. Gomez made excuses and repeatedly told G.S. "that he had a weak moment" and that A.S. "[had come] onto him." 2 VRP at 550, 552. Gomez said, "that it only happened once," and "that it was a mistake." 2 VRP at 550-52. A.S.'s statements to G.S. were also consistent with an inference of sexual contact, begging G.S. not to tell their parents. Construing all inferences of this testimony in favor of the State, a rational finder of fact could find that intentional sexual contact was proven beyond a reasonable doubt. *See Stevens*, 158 Wn.2d at 307; *see also Harstad*, 153 Wn. App. at 22-23.

This circumstantial evidence of sexual conduct, as opposed to inadvertent conduct, is further supported by testimony related to previous behavior between Gomez and A.S. Witnesses described behavior that was "more than friendly." 1 VRP at 341. There was apparently ongoing intimate conduct between the two—including Gomez touching the small of A.S.'s back, hugging, placing hands on hips—and expressions of love.

Even Gomez's own statements to Det. Lyle support an inference of sexual conduct during the incident. Gomez characterized A.S.'s movements while lying in his bed as sexual in nature, including that she was "pushing up against" him and "bumping" her backside against his leg, and

that she was "trying to get something to happen." Ex. 11 at 1 hr., 7 min., 32 sec. through 8 min., 36 sec.; 1 hr., 9 min., 22 sec.; 1 hr., 10 min., 42 sec.; 1 hr., 6 min., 59 sec. Together, Gomez's statements support an inference of intimate touching, rather than inadvertent benign contact. The trial court clearly did not find his subsequent denials to be credible—a decision we do not second-guess on appeal. *See Bergstrom*, 199 Wn.2d at 40-41. But even Gomez's description concedes intimate contact between a child and a non-caretaking adult, which supports an inference of contact for sexual gratification. *See Harstad*, 153 Wn. App. at 21.

Thus, based on this record and drawing all reasonable inferences most strongly against Gomez, a rational trier of fact could find beyond a reasonable doubt that Gomez engaged in intentional intimate touching for the purpose of sexual gratification, satisfying the "sexual contact" element of third degree child molestation.

## II. COMMUNITY CUSTODY CONDITIONS

Next, Gomez argues that several of his community custody conditions must be stricken or modified because they are either not crime related or unconstitutional. We disagree that any condition should be stricken, but we remand for the trial court to modify three community custody conditions—conditions 7, 8, and 10.

The trial court has discretion to require an offender to comply with any crime-related prohibitions. RCW 9.94A.703(3)(f). A "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted . . . ." RCW 9.94A.030(10). There must be a basis for connecting the condition to the crime. *State v. Geyer*, 19 Wn. App. 2d 321, 331, 496 P.3d 322 (2021).

We review de novo the sentencing court's statutory authority to impose a particular community custody condition. *State v. Houck*, 9 Wn. App. 2d 636, 646, 446 P.3d 646 (2019), *review denied*, 194 Wn.2d 1024 (2020). Otherwise, we review community custody conditions for an abuse of discretion. *State v. Wallmuller*, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). With respect to whether a community custody condition is crime related, a trial court does not abuse its discretion if there is a reasonable relationship between the conviction and the condition. *State v. Nguyen*, 191 Wn.2d 671, 683-84, 425 P.3d 847 (2018).

Imposing an unconstitutional condition is necessarily an abuse of discretion. *Wallmuller*, 194 Wn.2d at 238. But a community custody condition that limits a fundamental right is permissible, provided it is imposed sensitively. *State v. Bahl*, 164 Wn.2d 739, 757, 193 P.3d 678 (2008). Indeed, a convicted defendant's "First Amendment right 'may be restricted if reasonably necessary to accomplish the essential needs of the state and public order.' " *Id.* (internal quotation marks omitted) (quoting *State v. Riley*, 121 Wn.2d 22, 37-38, 846 P.2d 1365 (1993)).

A.  TESTING CONDITIONS—BREATH, URINE, AND POLYGRAPH

Gomez challenges community custody condition 7, which reads:

[Condition 7] Submit to urine and/or breath screening at the direction of the [CCO]

CP at 52 (Appendix F).

Gomez argues that this community custody condition is invalid for two reasons. First, Gomez argues that because he was not ordered to abstain from alcohol, breath screening is not related to ensuring his compliance with any other requirement. Second, Gomez argues that the

requirement for urine testing is not specifically limited to screening for compliance with his specific restriction on substance use.[5]

The State concedes both arguments. The State agrees that the "breath" screening requirement component of condition 7 should be struck because Gomez is permitted to consume alcohol. Resp't's Br. at 40-41. The State also concedes that condition 7 should include limiting language related to Gomez's compliance with substance use conditions.

We accept the State's concessions. Conditions that require testing for substance use are permissible "if, but only if," they "are narrowly tailored to achieve the State's compelling interest in monitoring [the defendant's] compliance with his validly imposed community custody conditions prohibiting alcohol and drug use . . . ." *State v. Nelson*, 4 Wn.3d 482, 503, 509, 565 P.3d 906 (2025). Thus, we remand condition 7 to the trial court to strike the provision for "breath" screening and to incorporate the necessary limiting language on the urine testing requirement.

Gomez next challenges community custody condition 8, which provides:

[Condition 8] Submit to polygraph examinations at the direction of the [CCO]

CP at 52.

Gomez argues that this condition implicates his First and Fifth Amendment rights because polygraph testing could compel him to speak and potentially to make incriminating statements.

---

[5] Relevant to both of Gomez's challenges to condition 7 is community custody condition 6, which prohibits Gomez from possessing controlled substances but does not forbid consuming alcohol. Condition 6 reads, "No possession or consumption of controlled substances without lawful prescription[.]" CP at 52.

Gomez argues that the condition must be narrowly tailored to limit the requirement to only monitor for compliance with other properly imposed community custody conditions.[6]

The State concedes that the condition should be remanded to limit the polygraph testing to only monitoring compliance with other community custody conditions.

We accept the State's concession. Trial courts have authority to impose polygraph testing. *State v. Riles*, 135 Wn.2d 326, 342, 957 P.2d 655 (1998), *abrogated on other grounds by State v. Sanchez Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010). But like substance use screening, polygraph testing should be limited to monitoring compliance with other conditions "and not as a fishing expedition to discover evidence of other crimes, past or present." *State v. Combs*, 102 Wn. App. 949, 953, 10 P.3d 1101 (2000). We remand condition 8 for the trial court to add language limiting the scope of the polygraph testing.

B. "ROMANTIC" RELATIONSHIP CONDITION —PRIOR APPROVAL AND COMPELLED DISCLOSURE OF SEX-OFFENDER STATUS

Gomez also challenges community custody condition 10, which provides:

[Condition 10] Obtain assigned CCO and treatment provider permission prior to engaging in a romantic or sexual relationship and disclose their status as a sex offender and the nature of their offending, to include unadjudicated victims, to anyone with whom they intend to begin such a relationship

CP at 52.

---

[6] Gomez also argues, in a single sentence, that community custody condition 8 should be modified to reflect that a polygraph examination can be compelled only if he receives a grant of immunity. But Gomez provides no legal authority or other support for his position. Thus, we decline to address it on appeal. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (Appellate courts will not consider arguments that are unsupported by citation to authority.); *see also* RAP 10.3(a)(6).

Gomez argues that this condition is both unconstitutional and not crime related. Gomez contends that the condition is unconstitutional because it implicates his right to engage in intimate association under both the Fourteenth Amendment of the United States Constitution and article I, section 3 of the Washington Constitution. He also argues that the compelled disclosure of his sex offender status is an unconstitutional compulsion of speech. Further, Gomez argues that the condition is not sensitively imposed and that "there is no legitimate State interest in regulating . . . Gomez's intimate associations or sexual activity with consenting adults." Opening Br. at 28.

Gomez also argues that the condition is not crime related because it applies broadly to *all* dating relationships, regardless of the involvement of minors. He argues that the requirements bear no reasonable relationship to the crime of third degree child molestation.

In response, the State concedes that the term "romantic relationship" should be removed and the term "dating relationship" be substituted, but otherwise, it argues that the substance of the condition should remain. Respondent Br. at 46.

As an initial matter, we accept the State's concession that the term "romantic relationship" should be removed and the term "dating relationship" be substituted. Our Supreme Court has held that the term "romantic" is subjective and vague. *See Nguyen*, 191 Wn.2d at 683; *see also State v. Peters*, 10 Wn. App. 2d 574, 591, 455 P.3d 141 (2019). But the term "dating relationship" is not unconstitutionally vague. *Nguyen*, 191 Wn.2d at 683.

Beyond this modification of the condition, we reject Gomez's arguments. As for his constitutional challenge, we conclude the condition is constitutionally firm. Condition 10 does not constitute a *total ban* on Gomez having dating relationships or engaging in sexual contact. Rather, it requires that Gomez inform his CCO or treatment provider and get approval before engaging in

sexual contact. Given the sexual nature of Gomez's crime against a minor, it is reasonable to require disclosures and approval to ensure the protection of minors. *See State v. Gantt*, 29 Wn. App. 2d 427, 456-57, 540 P.3d 845 (Disclosure and approval requirements are constitutional because they arm individuals " 'with knowledge of the potential risk [the offender] presents to minors' " and allow monitoring personnel, like CCOs and treatment providers, to take steps, when necessary, " 'to protect anyone embarking on a dating or sexual relationship with [the offender].' " (second alteration in original) (quoting *In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 60-61, 469 P.3d 322 (2020))), *review denied*, 3 Wn.3d 1002 (2024). Accordingly, we conclude the condition is sensitively imposed and reasonably necessary to protect public safety. *See Bahl*, 164 Wn.2d at 757.

We likewise reject Gomez's crime-relatedness argument. This kind of requirement for prior approval of *all* dating relationships and disclosure of sex offender status is " 'common for sexual offenders' " as " 'the offender's freedom of choosing even adult sexual partners is reasonably related to their crimes because potential romantic partners may be responsible for the safety of live-in or visiting minors.' " *Gantt*, 29 Wn. App. 2d at 456-57 (internal quotation marks omitted) (quoting *Sickels*, 14 Wn. App. 2d at 61). The condition bears a direct relationship to controlling Gomez's access to minors through potential future adult partners.

Thus, we remand community custody condition 10 to remove the term "romantic relationship" and substitute the term "dating relationship," but Gomez's remaining challenges to condition 10 fail.

No. 59506-1-II

## CONCLUSION

We affirm Gomez's conviction, but we remand to the trial court for modification of three of his community custody conditions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, A.C.J.

We concur:

_____
GLASGOW, J.

_____
CRUSER, J.